RADOVICH *v.* NATIONAL FOOTBALL
LEAGUE ET AL.

No. 94.   Argued January 17, 1957.—Decided February 25, 1957.

*Maxwell Keith* argued the cause for petitioner. With him on the brief were *Joseph L. Alioto* and *Elwood S. Kendrick.*

*Philip Elman* argued the cause for the United States, as *amicus curiae,* urging reversal. With him on the brief were *Solicitor General Rankin, Assistant Attorney General Hansen* and *Charles H. Weston.*

*Marshall E. Leahy* and *Bernard I. Nordlinger* argued the cause for respondents. *John F. O'Dea* was with them on a brief for the National Football League et al., respondents.

*Leo R. Friedman* filed a brief for Klawans et al., respondents.

MR. JUSTICE CLARK delivered the opinion of the Court.

This action for treble damages and injunctive relief, brought under § 4 of the Clayton Act,[1] tests the application of the antitrust laws to the business of professional football. Petitioner Radovich, an all-pro guard formerly with the Detroit Lions, contends that the respondents[2]

---

[1] 38 Stat. 731, 15 U. S. C. § 15, reads as follows:

"SEC. 4. That any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

Injunctive relief is provided for by 38 Stat. 737, 15 U. S. C. § 26.

[2] The respondents include the National Football League; its 10 member clubs at the time the complaint was filed: Boston Yanks, New York Giants, Philadelphia Eagles, Los Angeles Rams, Pittsburgh Steelers, Washington Redskins, Chicago Bears, Chicago Cardinals, Detroit Lions, and Green Bay Packers; the now defunct Pacific Coast League; the San Francisco Clippers, a member of the Pacific Coast League; Bert Bell, Commissioner of the National Football League; and J. Rufus Klawans, Commissioner of the Pacific Coast League.

entered into a conspiracy to monopolize and control organized professional football in the United States, in violation of §§ 1 and 2 of the Sherman Act; [3] that part of the conspiracy was to destroy the All-America Conference, a competitive professional football league in which Radovich once played; and that pursuant to agreement, respondents boycotted Radovich and prevented him from becoming a player-coach in the Pacific Coast League. Petitioner alleges that respondents' illegal conduct damaged him in the sum of $35,000, to be trebled as provided by the Act. The trial court, on respondents' motion, dismissed the cause for lack of jurisdiction and failure to state a claim on which relief could be granted. The Court of Appeals affirmed, 231 F. 2d 620, on the basis of *Federal Baseball Club* v. *National League,* 259 U. S. 200 (1922), and *Toolson* v. *New York Yankees, Inc.,* 346 U. S. 356 (1953), applying the baseball rule to all "team sports." It further found that even if such application was erroneous and that *United States* v. *International Boxing Club,* 348 U. S. 236 (1955), applied, Radovich had not grounded his claim on conduct of respondents which was "calculated to prejudice the public or unreasonably restrain interstate commerce." 231 F. 2d, at 623. We granted certiorari, 352 U. S. 818, in order to clarify the application of the *Toolson* doctrine and determine whether the business of football comes within the scope of the Sherman Act. For the reasons hereafter stated we conclude that *Toolson* and *Federal Baseball* do not con-

---

[3] 26 Stat. 209, 15 U. S. C. § 1, reads in pertinent part:

"SEC. 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is hereby declared to be illegal. . . ."

26 Stat. 209, 15 U. S. C. § 2, reads in pertinent part:

"SEC. 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . shall be deemed guilty of a misdemeanor . . . ."

trol; that the respondents' activities as alleged are within the coverage of the antitrust laws; and that the complaint states a cause of action thereunder.

## I.

Since the complaint was dismissed its allegations must be taken by us as true. It is, therefore, important for us to consider what Radovich alleged. Concisely the complaint states that:

1. Radovich began his professional football career in 1938 when he signed with the Detroit Lions, a National League club. After four seasons of play he entered the Navy, returning to the Lions for the 1945 season. In 1946 he asked for a transfer to a National League club in Los Angeles because of the illness of his father. The Lions refused the transfer and Radovich broke his player contract by signing with and playing the 1946 and 1947 seasons for the Los Angeles Dons, a member of the All-America Conference.[4] In 1948 the San Francisco Clippers, a member of the Pacific Coast League which was affiliated with but not a competitor of the National League, offered to employ Radovich as a player-coach. However, the National League advised that Radovich was black-listed and any affiliated club signing him would suffer severe penalties. The Clippers then refused to sign him in any position. This black-listing effectively prevented his employment in organized professional football in the United States.

2. The black-listing was the result of a conspiracy among the respondents to monopolize commerce in professional football among the States. The purpose of the conspiracy was to "control, regulate and dictate the terms upon which organized professional football shall be played throughout the United States" in violation of §§ 1 and 2 of the

---

[4] This Conference operated from 1946 through 1949 at which time it was disbanded.

Sherman Act. It was part of the conspiracy to boycott the All-America Conference and its players with a view to its destruction and thus strengthen the monopolistic position of the National Football League.

3. As part of its football business, the respondent league and its member teams schedule football games in various metropolitan centers, including New York, Chicago, Philadelphia, and Los Angeles. Each team uses a standard player contract which prohibits a player from signing with another club without the consent of the club holding the player's contract. These contracts are enforced by agreement of the clubs to black-list any player violating them and to visit severe penalties on recalcitrant member clubs. As a further "part of the business of professional football itself" and "directly tied in and connected" with its football exhibitions is the transmission of the games over radio and television into nearly every State of the Union. This is accomplished by contracts which produce a "significant portion of the gross receipts" and without which "the business of operating a professional football club would not be profitable." The playing of the exhibitions themselves "is essential to the interstate transmission by broadcasting and television" and the actions of the respondents against Radovich were necessarily related to these interstate activities.

In the light of these allegations respondents raise two issues: They say the business of organized professional football was not intended by Congress to be included within the scope of the antitrust laws; and, if wrong in this contention, that the complaint does not state a cause of action upon which relief can be granted.

## II.

Respondents' contention, boiled down, is that agreements similar to those complained of here, which have for many years been used in organized baseball, have

been held by this Court to be outside the scope of the antitrust laws.[5] They point to *Federal Baseball* and *Toolson, supra,* both involving the business of professional baseball, asserting that professional football has embraced the same techniques which existed in baseball at the time of the former decision.[6] They contend that *stare decisis* compels the same result here. True, the umbrella under which respondents hope to stand is not so large as that contended for in *United States* v. *International Boxing Club, supra,* nor in *United States* v. *Shubert,* 348 U. S. 222 (1955). There we were asked to extend *Federal Baseball* to boxing and the theater. Here respondents say that the contracts and sanctions which baseball and football find it necessary to impose have no counterpart in other businesses and that, therefore, they alone are outside the ambit of the Sherman Act. In *Toolson* we continued to hold the umbrella over baseball that was placed there some 31 years earlier by *Federal Baseball.* The Court did this because it was concluded that more harm would be done in overruling *Federal Baseball* than in upholding a ruling which at best was of dubious validity. Vast efforts had gone into the development and organization of baseball since that decision and enormous capital had been invested in reliance on its permanence. Congress had chosen to make no change.[7] All this, combined with the flood of litigation that would follow its repudiation, the harass-

---

[5] No contention is made that the business of professional football has any specific exemption from the antitrust laws.

[6] Since this action was dismissed on the pleadings, there has been no factual determination establishing the claimed similarity between the businesses of baseball and football.

[7] Congress did consider the extension of the baseball rule to other sports. In 1951 four separate bills were introduced to exempt organized professional sports from the antitrust laws. None of them were enacted. See H. R. 4229, 4230, 4231, and S. 1526, 82d Cong., 1st Sess. (1951).

ment that would ensue, and the retroactive effect of such a decision, led the Court to the practical result that it should sustain the unequivocal line of authority reaching over many years.

The Court was careful to restrict *Toolson's* coverage to baseball, following the judgment of *Federal Baseball* only so far as it "determines that Congress had no intention of including the business of baseball within the scope of the federal antitrust laws." 346 U. S., at 357. The Court reiterated this in *United States* v. *Shubert, supra,* at 230, where it said, "In short, *Toolson* was a narrow application of the rule of *stare decisis."* And again, in *International Boxing Club,* it added, *"Toolson* neither overruled *Federal Baseball* nor necessarily reaffirmed all that was said in *Federal Baseball. . . . Toolson* is not authority for exempting other businesses merely because of the circumstance that they are also based on the performance of local exhibitions." 348 U. S., at 242. Furthermore, in discussing the impact of the *Federal Baseball* decision, the Court made the observation that that decision "could not be relied upon as a basis of exemption for other segments of the entertainment business, athletic or otherwise. . . . The controlling consideration in *Federal Baseball* . . . was . . . the degree of interstate activity involved in the particular business under review." *Id.,* at 242–243. It seems that this language would have made it clear that the Court intended to isolate these cases by limiting them to baseball, but since *Toolson* and *Federal Baseball* are still cited as controlling authority in antitrust actions involving other fields of business, we now specifically limit the rule there established to the facts there involved, *i. e.,* the business of organized professional baseball. As long as the Congress continues to acquiesce we should adhere to—but not extend—the interpretation of the Act made in those cases. We did not extend them to boxing or the theater because we believed

that the volume of interstate business in each—the rationale of *Federal Baseball*—was such that both activities were within the Act. Likewise, the volume of interstate business involved in organized professional football places it within the provisions of the Act.

If this ruling is unrealistic, inconsistent, or illogical, it is sufficient to answer, aside from the distinctions between the businesses,[8] that were we considering the question of baseball for the first time upon a clean slate we would have no doubts. But *Federal Baseball* held the business of baseball outside the scope of the Act. No other business claiming the coverage of those cases has such an adjudication. We, therefore, conclude that the orderly way to eliminate error or discrimination, if any there be, is by legislation and not by court decision. Congressional processes are more accommodative, affording the whole industry hearings and an opportunity to assist in the formulation of new legislation. The resulting product is therefore more likely to protect the industry and the public alike. The whole scope of congressional action would be known long in advance and effective dates for the legislation could be set in the future without the injustices of retroactivity and surprise which might follow court action. Of course, the doctrine of *Toolson* and *Federal Baseball* must yield to any congressional action and continues only at its sufferance. This is not a new approach. See *Davis v. Department of Labor,* 317 U. S. 249, 255 (1942);[9] Compare *Rutkin* v. *United States,* 343 U. S. 130 (1952).

---

[8] Consideration of basic differences, if any, between the baseball and football businesses, such as the football draft system, use of league affiliations, training facilities and techniques, etc., is not necessary to this decision.

[9] The concurring opinion uses this language: "Such a desirable end cannot now be achieved merely by judicial repudiation of the *Jensen* doctrine." 317 U. S., at 259.

## III.

We now turn to the sufficiency of the complaint. At the outset the allegations of the nature and extent of interstate commerce seem to be sufficient. In addition to the standard allegations, a specific claim is made that radio and television transmission is a significant, integral part of the respondents' business, even to the extent of being the difference between a profit and a loss. Unlike *International Boxing,* the complaint alleges no definite percentage in this regard. However, the amount must be substantial and can easily be brought out in the proof. If substantial, as alleged, it alone is sufficient to meet the commerce requirements of the Act. See *International Boxing, supra,* at 241.

Likewise, we find the technical objections to the pleading without merit. The test as to sufficiency laid down by Mr. Justice Holmes in *Hart* v. *B. F. Keith Vaudeville Exchange,* 262 U. S. 271, 274 (1923), is whether "the claim is wholly frivolous." While the complaint might have been more precise in its allegations concerning the purpose and effect of the conspiracy, "we are not prepared to say that nothing can be extracted from this bill that falls under the act of Congress . . . ." *Id.,* at 274. See also *United States* v. *Employing Plasterers Assn.,* 347 U. S. 186 (1954).

Petitioner's claim need only be "tested under the Sherman Act's general prohibition on unreasonable restraints of trade," *Times-Picayune Publishing Co.* v. *United States,* 345 U. S. 594, 614 (1953), and meet the requirement that petitioner has thereby suffered injury. Congress has, by legislative fiat, determined that such prohibited activities are injurious to the public [10] and has

---

[10] In *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469 (1940), this Court said: "The end sought was the prevention of restraints to free com-

provided sanctions allowing private enforcement of the antitrust laws by an aggrieved party. These laws protect the victims of the forbidden practices as well as the public. *Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.*, 334 U. S. 219, 236 (1948). Furthermore, Congress itself has placed the private antitrust litigant in a most favorable position through the enactment of § 5 of the Clayton Act.[11] *Emich Motors Corp.* v. *General Motors Corp.*, 340 U. S. 558 (1951). In the face of such a policy this Court should not add requirements to burden the private litigant beyond what is specifically set forth by Congress in those laws.

Respondents' remaining contentions we believe to be lacking in merit.

We think that Radovich is entitled to an opportunity to prove his charges. Of course, we express no opinion as to whether or not respondents have, in fact, violated the antitrust laws, leaving that determination to the trial court after all the facts are in.

*Reversed.*

---

petition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services, *all of which had come to be regarded as a special form of public injury.*" (Emphasis supplied.) *Id.*, at 493. In *Standard Sanitary Mfg. Co.* v. *United States*, 226 U. S. 20 (1912), speaking of the antitrust laws, the Court said: "*The law is its own measure of right and wrong,* of what it permits, or forbids, and *the judgment of the courts cannot be set up against it* in a supposed accommodation of its policy with the good intention of parties, and it may be, of some good results." (Emphasis supplied.) *Id.*, at 49.

[11] 38 Stat. 731, 15 U. S. C. § 16, declares that a final judgment against a defendant in proceedings by the Government for violation of the antitrust laws may be introduced by a private litigant in a subsequent treble damage action and establishes *prima facie* a violation of the antitrust laws.

Mr. Justice Frankfurter, dissenting.

The difficult problem in this case derives for me not out of the Sherman Law but in relation to the appropriate compulsion of *stare decisis*. It does not derive from the Sherman Law because the most conscientious probing of the text and the interstices of the Sherman Law fails to disclose that Congress, whose will we are enforcing, excluded baseball—the conditions under which that sport is carried on—from the scope of the Sherman Law but included football. I say this, fully aware that the Sherman Law's applicability turns on the particular circumstances of activities pursued in trade and commerce among the several States. But whether the conduct of an enterprise is within or without the limits of the Sherman Law is, after all, a question for judicial determination, and conscious as I am of my limited competence in matters athletic, I have yet to hear of any consideration that led this Court to hold that "the business of providing public baseball games for profit between clubs of professional baseball players was not within the scope of the federal antitrust laws," *Toolson* v. *New York Yankees,* 346 U. S. 356, 357, that is not equally applicable to football.

But considerations pertaining to *stare decisis* do raise a serious question for me. That principle is a vital ingredient of law, for it "embodies an important social policy." *Helvering* v. *Hallock,* 309 U. S. 106, 119. It would disregard the principle for a judge stubbornly to persist in his views on a particular issue after the contrary had become part of the tissue of the law. Until then, full respect for *stare decisis* does not require a judge to forego his own convictions promptly after his brethren have rejected them.

The considerations that governed me two years ago in *United States* v. *International Boxing Club,* 348 U. S. 236,

have not lost their force by reason of the authority that time gives to a single decision. And so I am confronted with the *Toolson* case, *supra,* which guides me to find the present situation within its scope, and the *Boxing* case, *supra,* which, while it looks the other way, left *Toolson* as a living authority. Respect for the doctrine of *stare decisis* does not yet require me to disrespect the views I expressed in the *Boxing* case.

I would affirm.

MR. JUSTICE HARLAN, with whom MR. JUSTICE BRENNAN joins, dissenting.

What was foreshadowed by *United States* v. *International Boxing Club,* 348 U. S. 236, has now come to pass. The Court, in holding that professional football is subject to the antitrust laws, now says in effect that professional baseball is *sui generis* so far as those laws are concerned, and that therefore *Federal Baseball Club* v. *National League,* 259 U. S. 200, and *Toolson* v. *New York Yankees, Inc.,* 346 U. S. 356, do not control football by reason of *stare decisis.* Since I am unable to distinguish football from baseball under the rationale of *Federal Baseball* and *Toolson,* and can find no basis for attributing to Congress a purpose to put baseball in a class by itself, I would adhere to the rule of *stare decisis* and affirm the judgment below.

If the situation resulting from the baseball decisions is to be changed, I think it far better to leave it to be dealt with by Congress than for this Court to becloud the situation further, either by making untenable distinctions between baseball and other professional sports, or by discriminatory fiat in favor of baseball.