Cornelius HAWKINS, a/k/a Connie Hawkins, Plaintiff,

v.

NATIONAL BASKETBALL ASSOCIATION, an unincorporated association, J. Walter Kennedy, individually and as President of the National Basketball Association, Boston Celtics Basketball Club, an unincorporated Massachusetts trust, Zollner Corporation, a corporation, Cincinnati Basketball Club Co., a corporation, California Sports, Incorporated, a corporation, Madison Square Garden Corporation, a corporation, St. Louis Hawks Basketball Club, Inc., a corporation, Chicago Professional Basketball Corporation, a corporation, San Francisco Warriors, a partnership, the Baltimore Bullets Basketball Club, Inc., a corporation, and Riko Enterprises, Inc., a corporation, Defendants.[1]

Civ. No. 66-1320.

United States District Court
W. D. Pennsylvania.

Aug. 30, 1968.

[1]. The caption was amended by stipulation filed on August 13, 1968, wherein it was also stipulated that extra-territorial service of the summons and complaint was made on duly authorized agents of each corporate defendant, and each defendant waives any objection to the forms of the marshals' returns.

Roslyn M. Litman, and Howard A. Specter, of Litman, Litman & Harris, Pittsburgh, Pa., for plaintiff.

John G. Buchanan, Jr., of Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for defendants.

## OPINION AND ORDER

MARSH, District Judge.

The plaintiff commenced a civil anti-trust suit against the defendants requesting an injunction, a jury trial for treble damages, and alleging a conspiracy in violation of the anti-trust laws to bar him from player membership in the National Basketball Association. The alleged conspiracy began in November, 1963, and the plaintiff claims he sustained financial injury through the defendants' violation of the Sherman Anti-Trust Act, §§ 1 and 2, in that during the period prior to suit he has been deprived of his earning power as a professional basketball player. Cf. Radovich v. Nat. Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); Nichols v. Spencer International Press, Inc., 371 F.2d 332 (7th Cir. 1967).

The matter presently before the court is the motion of the defendants, supported by two affidavits, to dismiss for lack of proper venue.[2] Since the plaintiff has the burden of proving that venue is properly laid, ample time was given him to file counter-affidavits and take limited depositions or interrogatories to procure such proof. Since the anti-trust venue statutes are phrased in the present tense, it must be shown that the movants transacted business or were doing business in this district contemporaneously with the time of service, i. e., November 3, 1966, and with the time the cause of action arose, i. e., November, 1963 to November 3, 1966. Cf. 1 Barron and Holtzoff, Federal Practice and Procedure, § 80 (Supp.1967). Although the facts relevant to venue are unusual, it is the opinion of the court that plaintiff has met his burden of proof that venue was properly laid as to all movants, except The Chicago Professional Basketball Corporation (Chicago), owner of the Chicago Bulls.[3]

2. Venue is conceded as to the defendant, J. Walter Kennedy.

3. Chicago was issued a franchise in 1966 for the 1966–1967 season (deposition of Ben Kerner, p. 39). There was no proof that Chicago transacted or did business in Pennsylvania prior to November 3, 1966, the day suit was brought.

*Venue Facts*

The depositions, interrogatories, affidavits, complaint averments, and admissions of counsel have been considered. They disclose that plaintiff is a citizen of Pennsylvania; that the National Basketball Association (Association) is an unincorporated joint venture consisting of ten members,[4] having its principal place of business in New York; that J. Walter Kennedy is its Commissioner and Chief Executive Officer (formerly its President); and that the Association and Kennedy were properly served with process in Pittsburgh, Pennsylvania, on the 3rd day of November, 1966, the day suit was filed. The Association is governed by a Board of Governors consisting of 10 individuals, each being an officer of a member of the venture. Eight of the defendant members of the Association[5] is a corporation having its own officers and directors who manage its affairs; each owns and operates a basketball team, and two of them are also engaged in other substantial businesses, unrelated to basketball. The members are:

| Owner's Name | Team Name | Incorporated in |
|---|---|---|
| 1. Cincinnati Basketball Club Co. | Cincinnati Royals | Ohio |
| 2. Zollner Corporation (Zollner) | Detroit Pistons | Indiana (principal office in Michigan) |
| 3. California Sports, Incorporated (California) | Los Angeles Lakers | California |
| 4. Madison Square Garden Corporation (Madison) | New York Knickerbockers | Michigan (principal office New York, New York) |
| 5. Riko Enterprises, Inc. (Riko) | Philadelphia '76ers | Pennsylvania |
| 6. St. Louis Hawks Basketball Club, Inc. (St. Louis) | St. Louis Hawks | Missouri |
| 7. The Chicago Professional Basketball Corporation | Chicago Bulls | Illinois |
| 8. The Baltimore Bullets Basketball Club, Inc. (Baltimore) | Baltimore Bullets | Maryland |

———◆———

These professional basketball teams play against each other for profit in about 15 cities in the United States.

4. Transcript of December 20, 1966, p. 3, statement by counsel for the Association; defendants' Proposed Findings Nos. 1 and 2; deposition of J. Walter Kennedy, p. 23.

5. Service of process was not made upon two members of the Association, i. e., the Boston Celtics Basketball Club, a Massachusetts Trust, owner of the Boston Celtics, and the San Francisco Warriors, a California limited partnership. It was not proved that J. Walter Kennedy was an agent of these two entities; thus, as to them, there is no jurisdiction, and they are no longer defendants in this action.

Riko is a Pennsylvania corporation, having its principal office in Philadelphia. All of the other corporate members of the joint venture are foreign nonresident corporations, not registered to do business in Pennsylvania, and are not found here. These corporations have never been licensed to do business in Pennsylvania and maintain no offices, real estate, telephone listings, bank accounts, representatives or agents in the Western District of Pennsylvania.

Each of the corporate defendants' teams, except Chicago's and California's, have continuously played basketball games in Philadelphia, Pennsylvania, according to the Association's schedules, during the seasons of 1963–1964, 1964–1965, 1965–1966, and 1966–1967, prior to the filing of the suit, and all had scheduled games in that city for the remainder of the 1966–1967 season. California purchased the Los Angeles Lakers in September, 1965. California's team played three Association-scheduled basketball games in Philadelphia during the period involved, after the date of the purchase and prior to November 3, 1966. The regular schedules of the Association, including playoff games and exhibition games, consist of approximately 400 games. Each member team played approximately 75 to 82 scheduled games during a regular season. During this period two games scheduled in the 1963–1964 season were nationally televised from Philadelphia and the proceeds derived were divided equally among the member teams.[6]

During the period from November, 1963 to November 3, 1966, inclusive, the following teams played scheduled games at the Civic Arena in Pittsburgh, Pennsylvania: Philadelphia '76ers (Riko) vs. Boston Celtics, February 18, 1964; Philadelphia '76ers (Riko) vs. San Francisco Warriors, December 14, 1964; Detroit Pistons (Zollner) vs. Los Angeles Lakers (owned by predecessor to California), January 11, 1965; Philadelphia '76ers

(Riko) v. St. Louis Hawks (St. Louis), February 15, 1966; the Philadelphia '76ers (Riko) vs. St. Louis Hawks (St. Louis), November 3, 1966. The Philadelphia '76ers was the designated "home team" in the games it played in Pittsburgh and Riko received the financial guarantees. Five other games were scheduled to be played in Pittsburgh during the remainder of the 1966–1967 season.

Although only the "home teams" received revenue from Association-scheduled games, in the course of transacting this unique business, opposition teams reciprocally are the "home teams" in cities in other states.

The teams of the corporate defendants who played games in Pittsburgh and Philadelphia entered into contracts for transportation, board, lodging, and miscellaneous items with persons in those areas; the "home teams" advertised and developed interest in the games in order to increase their gate receipts.

Although the New York Knickerbockers, owned by Madison, did not play basketball in Pittsburgh during the period involved, the Knickerbockers did play an exhibition game against the team owned by Baltimore in Johnstown, Pennsylvania, in the Western District of Pennsylvania, and shared in the revenue produced by that game. In addition, in 1964 and 1965, Madison's American Hockey league team, the New York Rovers, engaged in seven regularly scheduled hockey games against the Johnstown Jets in Johnstown, Pennsylvania, and shared in the revenues from those games. Also, during the period involved Madison sent a representative to Pittsburgh to meet a prospective basketball player and has drafted two basketball players from this district for the New York Knickerbockers.

Not only did Zollner's Detroit Pistons play a regularly scheduled Association game in Pittsburgh in January of 1965, but in addition, Zollner operates manu-

---

6. Subsequently, there were additional nationally televised games, but the evidence does not reveal whether any of these games were played in Pennsylvania.

facturing plants in Ft. Wayne, Indiana, and in Canada, produces pistons and mold castings, and in this connection has solicited business in the Western and Eastern Districts of Pennsylvania on a regular basis since 1963. During the period involved Zollner's representative visited warehouse distributors in these districts every three or four months to solicit business, to advise customers of product development, to interpret engineering specifications, and to render any requested assistance. During that period this corporation has made sales regularly to N.A.P.A. Pittsburgh Warehouse and to Rex Sales Company in Pittsburgh, and to N.A.P.A. and Manley-Vida Distributing Company in Philadelphia. The combined sales to the two customers in Pittsburgh totaled over $150,000 during the period involved. Since 1963 Zollner has regularly purchased new material, components or manufacturing equipment in Western Pennsylvania. Advertisements of Zollner Corporation were placed in eight nationally distributed trade journals; offices of two of these publications were located in Philadelphia. We find Zollner Corporation not only transacted business in the Western and Eastern Districts of Pennsylvania but was doing business in both Districts.

*Venue as to the Corporate Defendants*

■ Venue requirements are governed by § 12 of the Clayton Act, 15 U. S.C.A. § 22, which provides:

"Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found."

This section supplemented former laws against unlawful restraints and monopolies of interstate trade, and venue and service of process was enlarged. Eastman Kodak Co. of New York v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927); United States v. Scophony Corp., 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091 (1948). It also enabled a person injured by illegal restraints in interstate trade "to institute the suit in a district, frequently that of his own residence, in which the corporation in fact transacts business, and bring it before the court by the service of process in a district in which it resides or may be 'found'." Eastman Kodak Co. of New York v. Southern Photo Materials Co., supra, 273 U.S. p. 374, 47 S.Ct. p. 403. The plaintiff presumably sustained the injurious impact of the alleged conspiracy in Pennsylvania, where he alleges citizenship. Cf. Sunbury Wire Rope Mfg. Co. v. United States Steel Corp., 230 F.2d 511, 514 (3d Cir. 1956); Giusti v. Pyrotechnic Industries, 156 F.2d 351 (9th Cir. 1946).

From the unique facts and circumstances surrounding this professional basketball league, the court finds as a fact that Riko, the Pennsylvania corporation, whose team played four association-scheduled games in Pittsburgh during the period involved, including a game on the day the complaint was filed, transacted business in this judicial district. The court finds that Zollner Corporation, whose team played one scheduled game in Pittsburgh, and who engaged in other continuous business of substantial character in this district during the period involved, and St. Louis, whose team played two scheduled games in Pittsburgh during the period involved, transacted business in this district. Also, the court finds that Madison, whose basketball team played one exhibition game for profit and whose hockey team played seven league games for profit in Johnstown, and who drafted two basketball players in this district during the period involved, transacted business in this district.

We think the business transacted by Riko, Zollner, St. Louis and Madison was of a substantial character in the ordinary and usual sense applicable to the owners of professional athletic team members

of a league; and, in addition, Zollner did business in this district in the ordinary and usual sense applicable to a manufacturing corporation.

The only business a corporation-owned professional athletic league team could engage in profitably is to systematically play games with other member teams according to Association schedules and play exhibition games in metropolitan cities. From this revenue-producing business, of necessity they enter into contracts for transportation, board, lodging and miscellaneous items with persons in those cities.

■ To say that these corporations transacted no business of any substantial character in this district would be to disregard the practical non-technical business standards applicable to professional athletic teams. The Association schedules were systematic and continuous during the seasons of 1963 through 1966. American Football League v. National Football League, 27 F.R.D. 264 (D.Md. 1961). As held in that case, "continuous" as applied to the specialized business of operating a professional athletic team does not mean without interruptions. Football teams sponsored by California partnerships, each playing only one game a year in Baltimore, Maryland, were held to be present in the District of Maryland "continuously" which supported a finding of proper venue. We are of the opinion that the corporate members of this professional athletic venture are not to be governed by rules evolved with reference to manufacturing or selling, nor by "atomizing" or "pulverizing" their activities into minute parts or events in disregard of the actual unity and continuity of their whole course of conduct. Cf. United States v. Scophony Corp., supra, 333 U.S. p. 817, 68 S.Ct. 855.

■ It is our opinion that the venue requirements as to these corporations have been met within the meaning of § 12 of the Clayton Act on the basis of

transacting business in the Western District of Pennsylvania.

Moreover, since all the teams owned by the defendant corporations, except Chicago's, played a number of Association-scheduled games in Philadelphia during the basketball seasons from 1963 to November 3, 1966,[7] the court finds as a fact that these corporations were doing business in the Eastern District of Pennsylvania. American Football League v. National Football League, supra, 27 F.R.D. p. 268. The continuous playing of regularly scheduled games in Philadelphia by teams owned by these foreign corporations, and their participation in the net profits received from games nationally televised from that city, is the essential business of this professional basketball league and it was substantial business.

■ Although Riko owned the "home team" and as such received the net proceeds of the games played in Philadelphia, from time to time most of the other teams participated in double headers in Philadelphia and were designated as the "home team" and as such shared in the net gate receipts from those Philadelphia games. Of course, Riko's team, reciprocating as part of the peculiar business of this venture, was required to play the "home team" of each foreign corporation in a foreign state without remuneration.

Section 1391(c), 28 U.S.C.A., provides:

"A corporation may be sued in any judicial district in which it is incorporated * * * or is doing business, and such judicial district shall be regarded as the residence of such corporation for venue purposes."

Thus we conclude that these defendant foreign corporations doing business in the Eastern District of Pennsylvania are to be regarded as residents of that district pursuant to this statute.

■ The defendants argue with considerable merit that the general venue

7. California's team played three such games in Philadelphia during the 1966–1967 season prior to November 3, 1966.

provisions are not applicable to anti-trust venue, but in our judgment the provisions contained in § 1391(c) supplement the liberal special venue provisions contained in § 12 of the Clayton Act (§ 22, 15 U.S.C.A.). Cf. Pure Oil Co. v. Suarez, 384 U.S. 202, 86 S.Ct. 1394, 16 L.Ed.2d 474 (1966).[8]

■ Riko, incorporated in Pennsylvania, is thus to be regarded as a resident of each of the three federal judicial districts of Pennsylvania for venue purposes. See: Carson v. Vance Trucking Lines, Inc., 245 F.Supp. 13 (W.D.S.C. 1965), citing Johnstone v. York County Gas Company, 193 F.Supp. 709, 711 (E. D.Pa.1961); Minter v. Fowler & Williams, Inc., 194 F.Supp. 660, 661 (E.D. Pa.1961); De George v. Mandata Poultry Company, 196 F.Supp. 192, 195 (E.D. Pa.1961). Likewise, Zollner, doing business in both the Eastern and Western Districts, is deemed to reside in both.

Section 1392(a), 28 U.S.C.A., provides:

> "Any civil action, not of a local nature, against defendants residing in different districts in the same State, may be brought in any of such districts."

Pursuant to this section, it is our opinion that this anti-trust civil action, not of a local nature, brought against the corporate defendants, may be brought in the Western District of Pennsylvania. The fact that Riko and Zollner, deemed to reside in the Western District of Pennsylvania, contemporaneously reside in the Eastern District of Pennsylvania where

their co-defendants, the foreign corporations, also reside for venue purposes, does not militate against venue in the Western District. Cf. Carson v. Vance Trucking Lines, Inc., supra; De George v. Mandata Poultry Company, supra, 196 F.Supp. p. 197.

In all the circumstances relating to the business activities engaged in by the members of this joint venture in Pennsylvania, the designation of this district as a place for their trial does not impress us as offending any of the basic principles of fairness. Cf. Lone Star Package Car Co. v. Baltimore & O. R. Co., 212 F.2d 147 (5th Cir. 1954).

Venue as to all the corporate defendants, except Chicago, is properly laid in the Western District of Pennsylvania.

### Venue as to National Basketball Association [9]

The only office of the Association is located in New York City, New York. The function of the Association is to operate a league of professional basketball teams; to establish and maintain schedules for games to be played between its member teams; to provide referees for the games; to establish and maintain playing rules; to establish and maintain rules for eligibility of players; to provide for means of establishing a league championship; and to perform other like functions consistent with the maintenance of a professional sports league. The Association is not operated for profit, nor does it own or operate any teams, but it serves to enable its mem-

---

**8.** In accord are State of New York v. Morton Salt Company, 266 F.Supp. 570 (E.D.Pa.1967); School Dist. of Philadelphia v. Harper & Row Publishers, Inc., 267 F.Supp. 1006 (E.D.Pa.1967). Contra, Chicago Football Associates v. American Football League, No. 66–C–1646 N.D.Ill., relied on by defendants. Prior to Pure Oil, this Circuit and District in Jones Act cases followed Fourco Glass Co. v. Transmirra Products Corp., 353 U.S. 222, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957), a patent case, and held the venue provisions in the Jones Act exclusive of § 1391(c). See: Leith v. Oil

Transport Company, 321 F.2d 591 (3d Cir. 1963). Subsequently, Pure Oil overruled Leith, holding § 1391 applied and the District Court cases dismissing for improper venue were reversed. Pierce v. Elk Towing Company, 364 F.2d 504 (3d Cir. 1966). Our approach to the special anti-trust venue provisions of the Clayton Act and our conclusion that those provisions would not be exclusive of § 1391 are guided by the policy expressed in Pure Oil.

**9.** Rule 17(b), Fed.R.Civ.P., provides that an unincorporated association may be sued in its common name.

bers to unite in a common enterprise and to realize profits from professional basketball games. Without a league, no member of the joint venture could operate profitably. Through the Board of Governors, the members of the joint venture in fact make the policy decisions and govern the league.

During the period involved, the Association regularly and systematically scheduled games in Pittsburgh and Philadelphia, the last game in Pittsburgh being on November 3, 1966, between the Philadelphia '76ers and the St. Louis Hawks. On that date, the individual defendant, J. Walter Kennedy, as Chief Executive Officer of the Association, as part of his duties, came to Pittsburgh for a press conference in the Presidential Suite of the Hilton Hotel in that city which he had scheduled and to which he invited members of the press. Present at this conference were Ben Kerner, the Chairman of the Association's Expansion Committee, and Haskell Cohen, the Association's Publicity Director. Pittsburgh was being considered by the Association as a potential NBA city if and when the league expanded. The costs of the conference facilities and refreshments were paid by the Association.

The Association received 6% of the gate receipts, after admission taxes, derived from all games which it scheduled and which were played in Pittsburgh and Philadelphia during the regular seasons from November, 1963 through November 3, 1966. This percentage was paid by the team designated as the "home team" for each such game. The attendance was over 100,000 persons each season. The receipts realized by the Association for each season were substantial.

The Association procured and paid the fees and expenses of basketball referees to travel to Pittsburgh and Philadelphia to referee the Association-scheduled games in these cities. Certain of these referees lived in the Eastern District of Pennsylvania.

By its Publicity Director, Haskell Cohen, the Association prepared and disseminated weekly releases to members of the press throughout the country, including Philadelphia and including ten persons in the Western District of Pennsylvania affiliated with news media in the Pittsburgh area.

As Commissioner of the Association, J. Walter Kennedy negotiated and signed contracts on behalf of the Association for national network telecasting of certain Association-scheduled games during the period involved. As stated, at least two games were nationally televised from Philadelphia during the period involved for the financial benefit of all the members of the joint venture. No doubt the proceeds from telecasts were an important part of the revenues of the members of the Association.

The venue requirements as to the Association are governed by § 15, Title 15 U.S.C.A., which provides:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

Whether or not venue is proper depends on the meaning of the term "found". In the light of Denver & R. G. W. R. Co. v. Brotherhood of R. R. Trainmen, 387 U.S. 556, 87 S.Ct. 1746, 18 L.Ed.2d 954 (1966), it seems that the term "found" should be construed with respect to an unincorporated association, whose members reside in several states, by analogy to a corporation and suit should be permitted wherever the Association is doing business. Id., p. 562, 87 S.Ct. 1746. In Sperry Products v. Association of American R. R., 132 F.2d 408, 145 A.L.R. 694 (2d Cir. 1942), a patent case, cited

**622**

by the Supreme Court in Denver & R. G. W. R. Co. v. Brotherhood of R. R. Trainmen, supra, the treatment of an unincorporated association was assimilated to the treatment accorded a corporation for venue purposes, which is in accord with the expanded concepts of venue reflected in anti-trust cases by Eastman Kodak Co. of New York v. Southern Photo Materials Co., supra; United States v. Scophony Corp., supra; and in Jones Act cases by Pure Oil Co. v. Suarez, supra; see also, 1 Barron and Holtzoff, Federal Practice and Procedure, § 80 (Supp.1967).

Under the facts it would seem that the joint venture is "doing business" in any judicial district where the team of a corporate or non-corporate member of the venture continuously plays regularly scheduled league basketball games from which the Association derives substantial financial benefit. Thus, the court finds as a fact that the Association during the period involved did substantial business continuously [10] in both the Western and Eastern Districts of Pennsylvania, especially in the latter. Furthermore, since the Association is an entity created and governed by the joint adventurers, basic principles of fairness seem to dictate that venue requirements should be deemed met in judicial districts where the members of that joint venture, the alleged co-conspirators, transact or do business.

Like Riko, the Pennsylvania corporation, the Association by doing business in both judicial districts, resides in both, and certainly in the Eastern District, as do all its other corporate members, and, for that matter, its non-corporate members.[11] Hence, it follows that pursuant to § 1392(a), 28 U.S.C.A., quoted supra, venue as to the Association is properly laid in the Western District of Pennsylvania.

An appropriate order will be entered.

10. See: American Football League v. National Football League, supra, 27 F.R.D. p. 268.