**Mary Anne O'REGAN, and National Arbitration Systems, Incorporated, an Illinois corporation, Plaintiffs–Appellants,**

v.

**ARBITRATION FORUMS, INCORPORATED, a New York non-profit corporation, and Yvonne Weaver, an Individual and as President of Arbitration Forums, Incorporated, Defendants–Appellees.**

No. 96–2290.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 22, 1997.

Decided July 31, 1997.

As Amended on Denial for Rehearing and Suggestion for Rehearing En Banc Sept. 8, 1997.

---

James J. O'Regan (argued), Northbrook, IL, for Plaintiffs–Appellants.

Robert W. Pratt, Donald J. McNeil (argued), Norma W. Zeitler, Keck, Mahin & Cate, Chicago, IL, for Defendants–Appellees.

Before CUDAHY, ROVNER and EVANS, Circuit Judges.

CUDAHY, Circuit Judge.

Mary Anne O'Regan began working for Arbitration Forums, Inc. (AF) in April of 1989. AF is a trade association of insurance companies; its primary purpose is to arbitrate auto liability disputes among its member companies. O'Regan was successful during her tenure; she was promoted twice and in January of 1990 became the Central Region Manager. In July of 1990 Yvonne Weaver assumed the Presidency of AF. O'Regan believes that Weaver began immediately to favor young, attractive, inexperienced males over their older female counterparts within AF. Nevertheless, it took until September 21, 1993 for O'Regan to report certain allegedly improper activities of Weaver to two members of AF's Board of Directors (and thus, constructively at least, to the entire Board).[1] On September 23, 1993 O'Regan received from AF a non-competition agreement; the agreement purported to restrict AF employees from engaging in competition with AF anywhere in the United States for two years after leaving AF's employ.[2] Accompanying the agreement was a memorandum directing her to sign it or face termination of her employment within ten days. The memorandum indicated that adherence to the non-competition agreement was required of all management and profes-

---

1. We note that the information about Weaver that O'Regan claims to have communicated to the AF Board on September 21, 1993 includes comment on events that did not occur until *after* September 21, 1993. These events include the circulation by AF of the September 23, 1993 non-competition agreement to its employees and several personal events in Weaver's life (*e.g.*, her marriage to a co-worker).

2. The actual language of the covenant restricted each AF employee "directly or indirectly, either as an individual on his or her own account or as a partner, joint venturer, employer, agent, salesman, contractor, officer, director, or stockholder or otherwise, [from] enter[ing] into, engag[ing] in, or accept[ing] employment from any business in competition with the business of [AF], as such business now exists or as it may exist at the time of termination, anywhere in the United States."

sional employees of AF. O'Regan refused to sign, saying that she believed the agreement to be in violation of Illinois law, "overbroad in its scope, Draconian in its provisions," and constituting an undue restraint of trade. She was therefore duly terminated.

■ At that point O'Regan brought a number of claims against AF, including claims for breach of oral promise, promissory estoppel, breach of implied contract, retaliatory discharge, sex and age discrimination, tortious interference, Sherman Act violations, Illinois Antitrust Act violations and conspiracy. The district court dismissed all of O'Regan's claims, most for failure to state a claim and some for lack of standing. She now appeals only the dismissal of the retaliatory discharge, sex and age discrimination and antitrust claims. Our review, of course, is on the face of the complaint, taking all O'Regan's allegations to be true. She also challenges the district court's refusal to grant her motion to add an additional party and to allow her to file a second amended complaint. We address each claim in turn.

## I. Retaliatory Discharge

O'Regan believes that she was retaliatorily discharged for her whistle-blowing activities in reporting derogatory information about Weaver. She claims she "blew the whistle" on Weaver by reporting to AF Board members that: (1) Weaver was reporting personal "junkets" as tax-exempt business trips, (2) Weaver and AF were engaged in persistent age and sex discrimination and (3) Weaver and AF were violating the Illinois Antitrust Act and the Sherman Act in requiring adherence to the noncompetition agreement.

■ Illinois follows the common-law doctrine that employment-at-will [3] means termination-at-will and is presumed to exist whenever an employee is hired without a fixed term. See *Duldulao v. St. Mary of Nazareth Hosp. Ctr.*, 115 Ill.2d 482, 106 Ill.

Dec. 8, 11–12, 505 N.E.2d 314, 317–18 (1987). The tort of retaliatory discharge is a narrow exception to that rule. See *Barr v. Kelso–Burnett Co.*, 106 Ill.2d 520, 88 Ill.Dec. 628, 630, 478 N.E.2d 1354, 1356 (1985). It permits an employee "who is dismissed in violation of a clearly mandated public policy to bring a cause of action for retaliatory discharge." *Belline v. K–Mart Corp.*, 940 F.2d 184, 186 (7th Cir.1991). To establish her claim of retaliatory discharge O'Regan must prove that she was (1) discharged (2) in retaliation for her activities and (3) that the discharge violated a clear mandate of public policy. Id. In Illinois, public policy is limited to those matters that "strike at the heart of a citizen's social rights, duties, and responsibilities" and do not impinge only on private interests. *Palmateer v. Int'l Harvester Co.*, 85 Ill.2d 124, 52 Ill.Dec. 13, 16–17, 421 N.E.2d 876, 878–79 (1981).

■ O'Regan has shown that she was discharged, leaving for further consideration only the questions of why and whether the ascertained reason violated Illinois public policy. O'Regan's claim fails not primarily on public policy grounds, which we do not decide dispositively, but on the grounds that O'Regan has failed to allege facts sufficient to show retaliation. The precipitating event of O'Regan's termination was her refusal to sign AF's non-competition agreement. O'Regan asserts that she was required to sign the agreement in retaliation for her whistle-blowing activities. The noncompetition agreement, however, came into existence (and was circulated to at least some employees) on April 23, 1993,[4] well *before* O'Regan reported Weaver's allegedly illegal actions to the AF Board on September 21, 1993. Further, and very importantly, O'Regan does not allege that she was treated differently than other employees with respect to the non-competition agreement. Thus O'Regan has failed to allege that her termination in response to the

---

**3.** In the court below O'Regan alleged that she was not an employee-at-will but instead was working under an oral contract and an implied contract. The district court found for AF and O'Regan has not appealed that determination.

**4.** An interoffice memorandum dated April 23, 1993 and distributed to "All Management and Professional-Level Employees—Home Office," was attached to O'Regan's Second Amended Complaint as Exhibit I. This memorandum discusses the language of the noncompetition agreement and employee concerns in that regard.

non-competition agreement could have been in retaliation for her report to the Board.

O'Regan argues that her termination violated Illinois public policy because she reported what she believed to be violations of federal income tax law by Weaver in taking improper business expense deductions. O'Regan reported that she thought Weaver was claiming as business trips what were really personal junkets. Reporting what is apparently criminal behavior, even if the reporting is done only internally (*i.e.*, not to law enforcement agencies), as was done here, has often been protected against retaliatory discharge. *See, e.g., Belline,* 940 F.2d at 187. Determining whether a trip is for business or pleasure, however, may require the drawing of a fine line. And there is little here that clearly suggests *criminal* tax violations. O'Regan's allegation involving tax cheating by Weaver was accompanied by other charges that Weaver was exhibiting favoritism for young males generally, in part by having them accompany her on business trips. Thus, O'Regan's complaints may very well not have been of the sort protected under Illinois' definition of public policy. If, for example, O'Regan had reported that Weaver had repeatedly failed to file income tax returns at all, perhaps (although this is not clear) her reporting might have implicated a relevant Illinois public policy. We can find no reported case in which a purported violation of federal tax laws is claimed to violate Illinois public policy for retaliatory discharge purposes. We think that the public policy point is weak; but in any event O'Regan's claim fails because she has failed to allege facts showing that she was discharged *in retaliation.*

■■■ O'Regan also argues that firing her for refusing to sign the non-competition agreement was itself a retaliatory discharge. Because she believes that AF's non-competition agreement itself violates federal and state antitrust laws, she believes that to fire her for refusing to sign it constitutes a retaliatory discharge in violation of Illinois public policy.[5] O'Regan's claim again fails. She cannot show that firing her for refusing to

sign the non-competition agreement violated Illinois public policy. While a cause of action for retaliatory discharge "is allowed where the public policy is clear, . . . [the cause of action] is denied where it is equally clear that only private interests are at stake." *Long v. Commercial Carriers, Inc.,* 57 F.3d 592, 595 (7th Cir.1995) (internal quotations and citations omitted). O'Regan's antitrust claims based on the noncompetition agreement fail (as we discuss below), leaving only her private interest in her job; thus her retaliatory discharge claim is barred. Further, retaliatory discharge claims have been recognized only when an employee is fired for filing a workers' compensation claim or for blowing the whistle on a clear-cut law violation. *See Lambert v. City of Lake Forest,* 186 Ill. App.3d 937, 134 Ill.Dec. 709, 712, 542 N.E.2d 1216, 1219 (1989). The requirement to sign the noncompetition agreement here does not involve whistle-blowing as ordinarily defined since there is no disclosure of an illegal practice. Here the practice seems well-known but O'Regan refuses to assent to it. In any case, Illinois has not broadened the definition of whistle-blowing beyond instances where the alleged improper conduct reported is clear, violative of public policy and serious. For example, retaliatory discharge claims have not been allowed where a city manager was fired by the mayor for refusing to perform his official duties improperly for the political benefit of the mayor, *Fellhauer v. City of Geneva,* 142 Ill.2d 495, 154 Ill.Dec. 649, 568 N.E.2d 870 (1991), nor have they been allowed where an employee was fired for refusing to lie to an investigator and an attorney in an entirely internal city investigation. *Lambert,* 134 Ill.Dec. at 713, 542 N.E.2d at 1220.

The antitrust violations alleged by O'Regan (with respect to the non-competition agreement) are not clear and do not go " 'to the heart of a citizen's social rights, duties, and responsibilities.' " *Long,* 57 F.3d at 595 (citation omitted). Refusing to sign a noncompetition agreement of the sort involved here does not, as we have noted, qualify under the ordinary definition of whistle-blow-

---

5. O'Regan also claims that her refusal to sign was a refusal to engage in an illegal act. She did not raise this argument below; thus we decline to address it.

ing, nor is it an action akin to making a workers' compensation claim; thus O'Regan's refusal to sign does not clearly implicate Illinois public policy. Therefore, the district court properly dismissed the retaliatory discharge claims.

## II. Sex & Age Discrimination

■■■ O'Regan alleges that from the time Weaver became the President of AF, Weaver engaged in sex and age discrimination by favoring "attractive young inexperienced males" over "highly experienced, middle-aged female employees." O'Regan Br. at 2526. O'Regan believes the non-competition agreement was proposed as a pretext for firing these female managers and replacing them with younger males.[6]

The district court found that O'Regan failed to show discriminatory dissemination or discriminatory application of the agreement because an AF memorandum indicated that the non-competition agreement was required of all management and professional employees. The district court dismissed the sex and age discrimination claims without prejudice and suggested the possibility of O'Regan's amending her claims to show that the noncompetition agreement had been distributed or enforced in a discriminatory manner. AF and Weaver argue that O'Regan, even if she could prove that Weaver favored young males and disfavored older females, has not attempted to "link" Weaver's attitudes with an adverse employment action relating to O'Regan. But it seems that this is what O'Regan was really trying to do. O'Regan's argument is that Weaver, since she became President of AF, has favored young men over older women. Weaver has allegedly engaged in a variety of practices over three years (e.g., taking business trips

with men, soliciting favors and errands from men, forcing women managers out and replacing them with younger men and fostering personal relationships with male employees) culminating in her proposal of the noncompetition agreement. O'Regan alleges that Weaver "axed 7 [middle-aged females from AF management positions] ... and she axed another 4, including O'Regan by means of the Employment Agreement." O'Regan R. Br. at 11. O'Regan alleges that Weaver knew the four women managers would refuse to sign the non-competition agreement.

We believe that this is enough to withstand a motion to dismiss the sex and age discrimination claims, where we must accept the allegations as true. These claims might fail on summary judgment, but at this point they should not be dismissed. We thus remand them for further proceedings.

## III. Antitrust Claims

### A. O'Regan's Antitrust Cause of Action

■■■■ O'Regan's federal and state antitrust claims were dismissed for lack of standing to bring the claims. O'Regan believes that she has standing as an individual and as a representative of National Arbitration Systems, Inc. (NAS), the arbitration firm started by O'Regan after she was fired. Her reasoning is that the non-competition agreement restrained trade by binding employees to AF. But an employee discharged for refusing to participate in an alleged antitrust violation has no standing to sue on the basis of that violation. *Bichan v. Chemetron Corp., (In re Industrial Gas Antitrust Litigation)*, 681 F.2d 514, 519 (7th Cir.1982).[7] Because O'Regan refused to sign the non-competition agreement, she did not participate in the alleged anticompetitive activity. Further, to

---

6. Alternatively, she argues that the non-competition agreement was designed as a way to effect her discharge because of her complaints of Weaver's sex and age discrimination to the AF Board of Directors. O'Regan's retaliation claim here, like her retaliation claim above, fails since the noncompetition agreement was in the works long before she "reported on" Weaver to the AF Board.

7. O'Regan argues that *Radovich v. National Football League*, 352 U.S. 445, 77 S.Ct. 390, 1

L.Ed.2d 456 (1957), and *Nichols v. Spencer Int'l Press*, 371 F.2d 332 (7th Cir.1967), should control instead of *In re Indus. Gas*. But we distinguished both *Radovich* and *Nichols* in *In re Indus. Gas*. *In re Industrial Gas*, 681 F.2d at 517. Here, as in *Industrial Gas*, O'Regan does not allege *inter-firm* agreements which restrict competitive conditions in the labor market. Thus, like the plaintiff in *In re Indus. Gas*, she lacks antitrust standing.

apply antitrust laws to restrictive employment covenants, there must be some attempted enforcement of an arguably overbroad portion of the covenant in order for there to be a federal antitrust violation. *See Lektro–Vend Corp. v. Vendo Co.*, 660 F.2d 255, 267 (7th Cir.1981). Nor can O'Regan maintain an action on behalf of NAS. *See Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1378 (7th Cir.1987) ("Merely derivative injuries sustained by employees, officers, stockholders, and creditors of an injured company do not constitute 'antitrust injury' sufficient to confer antitrust standing.").

■■■■■ O'Regan's state antitrust claims were likewise properly dismissed. Federal antitrust standing rules apply under the Illinois Antitrust Act. *See Illinois ex rel. Burris v. Panhandle Eastern Pipe Line Co.*, 935 F.2d 1469, 1479–80 (7th Cir.1991). O'Regan's Illinois Antitrust Act claims are barred for two further reasons. The Act only covers services "performed in whole or in part for the purposes of financial gain." 740 ILL. COMP. STAT. ANN. § 10/4 (1997). The Act was intended to apply only to conduct relating to for-profit enterprises. Id. at § 10/2. AF is a non-profit corporation, not covered by the Illinois Antitrust Act. Finally, to the extent O'Regan's claims relate to an alleged market for labor services, they are specifically excluded by § 10/4 of the Act, which states that " '[s]ervice' shall not be deemed to include labor which is performed by natural persons as employees of others." Id. at § 10/4. The dismissal of her state and federal antitrust claims for lack of standing was therefore correct.

### B. NAS' Antitrust Cause of Action

In the complaint as originally filed, NAS was not a party to the lawsuit; O'Regan was the only plaintiff. In her proffered, but unaccepted, second amended complaint O'Regan attempted to join NAS as a plaintiff on the antitrust claims with respect to the non-competition agreement. The district court did not allow the amendment on the grounds

that there was no cause of action for NAS to join. Because O'Regan had no standing to pursue her antitrust claims, the district court had dismissed the original antitrust action.

■■■■ O'Regan now appeals the district court's refusal to allow her second amended complaint, adding NAS as a plaintiff, to be filed. Missing from the changes in the first complaint which were incorporated in the second amended complaint was an amendment sufficient to provide O'Regan with standing to sue for antitrust injuries. Because the second amended complaint provides no new rationale allowing O'Regan to continue with her antitrust claims, it likewise gave the court no reason to allow NAS to join. The district court noted that NAS, if it had a valid cause of action, was free to file its own case. This disposition does not involve an abuse of discretion.

The dismissal of the retaliatory discharge and antitrust claims is therefore AFFIRMED. The refusal to permit amendment of the complaint or the filing of a second amended complaint is AFFIRMED. The dismissal of the age and sex discrimination claims is REVERSED and REMANDED for further proceedings in accordance with this opinion.[8]

---

**8.** The district court's dismissal of the claims against Weaver is AFFIRMED. An employer's agent cannot be held individually liable under Title VII or the ADEA for allegedly discriminatory act. *See Williams v. Banning*, 72 F.3d 552, 555 (7th Cir.1995).