2022 IL App (1st) 210840

FIFTH DIVISION
Order filed: June 3, 2022

No. 1-21-0840

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE STATE OF ILLINOIS, by its Attorney General, KWAME RAOUL, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 2020 CH 5156 |
| ELITE STAFFING, INC., METRO STAFF, INC., MIDWAY STAFFING, INC., and COLONY DISPLAY LLC, | ) ) ) ) ) | Honorable Raymond W. Mitchell, |
| Defendants-Appellants. | ) | Judge, presiding. |

_____

JUSTICE HOFFMAN delivered the judgment of the court, with opinion.
Presiding Justice Delort and Justice Cunningham concurred in the judgment and opinion.

**OPINION**

¶ 1    The Attorney General of Illinois on behalf of the State of Illinois filed the instant action

against three staffing agencies, Elite Staffing, Inc., Metro Staff, Inc., and Midway Staffing, Inc.

(hereinafter collectively referred to as the "Agency Defendants"), and their mutual client Colony

Display, LLC (Colony), alleging that the defendants entered into unlawful conspiracies in violation

of the Illinois Antitrust Act (Act) (740 ILCS 10/1 *et seq.* (West 2018)). The defendants filed two

motions to dismiss the action pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2020). The circuit court denied the defendants' motions and thereafter, in response to the defendants' motions, certified the following two questions for interlocutory appeal pursuant to Illinois Supreme Court Rule 308 (eff. Oct. 1, 2019):

> 1. Whether the definition of "Service" under Section 4 of the Illinois Antitrust Act, 740 ILCS 10/4 [("Act")], which states that Service "shall not be deemed to include labor which is performed by natural persons as employees of others," applies to the [Act] as a whole and thus excludes all labor services from the [Act]'s coverage.

> 2. Whether the *per se* rule under Section 3(1) of the [Act], 740 ILCS 10/3(1), which states that it applies to conspiracies among "competitor[s]," extends to alleged horizontal agreements facilitated by a vertical noncompetitor.

We answer the first question, with a modification for clarity and accuracy, by holding that the services provided by staffing agencies are generally not excluded from the Act's coverage. The second question we answer as written by holding that the *per se* rule can apply to horizontal agreements facilitated by vertical noncompetitors when such agreements evidence naked restraint of competition.

¶ 2 The following facts are drawn from the allegations in the State's complaint, which we accept as true and construe in the State's favor at the motion-to-dismiss stage. See *Borowiec v. Gateway 2000, Inc.*, 209 Ill. 2d 376, 382 (2004).

¶ 3 Colony designs, manufactures, and installs customized fixtures, exhibits, and displays for home improvement, retail, and hospitality businesses. It relies heavily on temporary workers to carry out this work, with such employees generally comprising the majority of its workforce. The

Agency Defendants are temporary staffing agencies that recruit, select, and hire employees for their clients. Colony hired all three Agency Defendants to perform such services at two of Colony's facilities.

¶ 4    In addition to the initial hiring of temporary employees, Colony also tasked the Agency Defendants with a degree of ongoing management of the temporary employees. This included the Agency Defendants providing dedicated on-site supervisors at Colony's facilities, paying the temporary employees' wages and benefits, and retaining sole authority over the hiring, assigning, and firing of the temporary employees assigned to Colony.

¶ 5    The State alleges in its complaint that during their work for Colony, the Agency Defendants "agreed with each other not to recruit, solicit, hire, or 'poach' temporary employees from one another at Colony's facilities," and that "Colony facilitated the Agency Defendants' agreement by acting as a go-between to communicate about the agreement among the Agency Defendants and by assisting in enforcing the Agency Defendants' no-poach conspiracy." In support of this allegation that Colony facilitated the conspiracy, the State cites numerous communications between various representatives of the Agency Defendants and the CEO of Colony. As further proof of the conspiracy, the State also cites communications among representatives of the Agency Defendants themselves.

¶ 6    The State also alleges in its complaint that, at Colony's request, the Agency Defendants agreed to fix the wages of their temporary employees at a below-market rate determined by Colony. As with the alleged no-poach agreement, the State alleges that Colony facilitated the Agency Defendants' communications regarding this alleged wage-fixing conspiracy. The State's complaint presents the two alleged conspiracies as *per se* violations of the Act that can be deemed

illegal without any further consideration of the competitive and economic purposes and consequences of the alleged arrangements.

¶ 7　The defendants together filed two motions to dismiss pursuant to section 2-615 of the Code, arguing, among other things, that their business of "supplying labor," which the Agency Defendants also refer to as "labor services," is exempt from the Act's coverage and that the facilitation of the conspiracies by a vertical non-competitor (Colony) removes the alleged conspiracies from the ambit of subsection 3(1) of the Act (740 ILCS 10/3(1) (West 2018)).

¶ 8　The circuit court rejected the defendants' arguments and denied their motions to dismiss. The defendants then moved for the court to certify two questions for interlocutory appeal under Supreme Court Rule 308. The court granted the request and certified the two questions set forth above. We allowed the interlocutory appeal.[1]

¶ 9　Rule 308 "allows for permissive appeal of an interlocutory order certified by the trial court as involving a question of law as to which there is substantial ground for difference of opinion and where an immediate appeal may materially advance the ultimate termination of the litigation." *In re Estate of Luccio*, 2012 IL App (1st) 121153, ¶ 17. When reviewing a certified question, "we are limited to answering the specific question certified by the trial court[,] to which we apply a *de novo* standard of review." *Id.* (citing *Moore v. City of Chicago Park District*, 2012 IL 112788, ¶ 9). When conducting that review, the "scope of review is generally limited to the certified question." *Id.* at ¶ 25 (citing *Moore*, 2012 IL 112788, ¶ 9). However, when appropriate a court

---

[1] In addition to the briefs filed by the parties, we have also reviewed briefs filed by *amici curae* Staffing Services Association of Illinois, Raise the Floor Alliance, National Legal Advocacy Network, National Employment Law Project, and Professor Eric A. Posner. The court appreciates their additional perspectives.

may "modif[y] a certified question or read a certified question in such a way as to bring it within the ambit of a proper question of law." *Id.* at ¶ 28.

¶ 10 We begin with the first certified question: "Whether the definition of 'Service' under Section 4 of the Illinois Antitrust Act, 740 ILCS 10/4, which states that Service 'shall not be deemed to include labor which is performed by natural persons as employees of others,' applies to the Act as a whole and thus excludes all labor services from the Act's coverage."

¶ 11 Although it presents a proper question of law, we must modify the first certified question because, as written, it contains an erroneous premise that application of section 4's definition of "service" to the entire Act necessarily exempts so-called "labor services" from the Act's coverage. As we explain below, that is not the case. However, because the essence of the question is apparent in the parties' briefs and the record, we will still answer the question after rephrasing it to address the core issue: whether the exclusion of individual labor from the definition of "service" in section 4 of the Act also excludes the labor-related services provided by temporary staffing agencies and therefore exempts such agencies from the Act's coverage. See *Fireman's Fund Insurance Co. v. SEC Donohue, Inc.*, 176 Ill. 2d 160, 166 (1997) (modifying a certified question to delete an erroneous statement of law); *Batson v. Township Village Associates, LP*, 2019 IL App (5th) 170403, ¶ 30 (modifying an "inartfully worded and incomplete" certified question to address what it "essentially asks"). For the reasons explained more fully below, we hold that it does not.

¶ 12 Our analysis begins with the statutory provisions governing the defendants' alleged antitrust violations. The State alleges that the defendants' no-poach and wage-fixing conspiracies each violated subsection 3(1) of the Act. In relevant part, that subsection prohibits conspiring to

take various specified anticompetitive actions towards a "service." 740 ILCS 10/3(1) (West 2018). It is the definition of the term "service" that is the central issue in the first certified question.

¶ 13    Section 4 of the Act, titled "Definitions," provides two definitions of the term "service." 740 ILCS 10/4 (West 2018). That section first states that, "[a]s used in this act, unless the context requires otherwise: * * * 'Service' shall mean any activity, not covered by the definition of 'commodity,' which is performed in whole or in part for the purpose of financial gain." *Id.* "Commodity," in turn, is defined as "any kind of real or personal property." *Id.* There is no dispute that the alleged conspiracies in this case do not concern commodities. Therefore, we focus on the meaning of "service," and in particular section 4's second definition of the term, which provides that " '[s]ervice' shall not be deemed to include labor which is performed by natural persons as employees of others." *Id.* The Agency Defendants read this second definition, and specifically its use of the term "labor," as excluding from the Act's coverage the "labor services" that they provide to their clients.

¶ 14    Our consideration of this issue of statutory interpretation is governed by the well-established principle that "[o]ur primary objective in construing a statute is to ascertain and give effect to the intent of the legislature." *In re Estate of Luccio*, 2012 IL App (1st) 121153, ¶ 21 (citing *In re Estate of Ellis*, 236 Ill. 2d 45, 50 (2009)). "The best evidence of legislative intent is the language of the statute itself, which must be given its plain and ordinary meaning." *Id.* (citing *Ellis,* 236 Ill. 2d at 50).

¶ 15    We view the plain language of section 4's definitions of "service" to be unambiguous and sufficiently clear to resolve the question presented. The second definition clearly expresses the idea that an individual's labor for their employer is not a service. The obvious intention behind

this is to allow individuals to engage in otherwise anticompetitive behavior regarding their own labor by participating in collective bargaining and related conduct. We find support for this conclusion in the labor exception contained in section 5 of the Act (740 ILCS 10/5 (West 2018)).

¶ 16    Section 5, titled "Exceptions," provides, in relevant part, that "[n]o provisions of this Act shall be construed to make illegal: (1) the activities of any labor organization or of individual members thereof which are directed solely to labor objectives which are legitimate under the laws of either the State of Illinois or the United States." *Id.* The Bar Committee Comments, which both the supreme court and this court have considered when interpreting the Act (see *Laughlin v. Evanston Hospital*, 133 Ill. 2d 374, 386–87 (1990), and *Blake v. H-F Group Multiple Listing Service*, 36 Ill. App. 3d 730, 741 (1st Dist. 1976)), explain that "[t]he labor exemption in subsection (1), like that of Section 6 of the Clayton Act, prevents the application of the Antitrust Act to legitimate labor objectives and activities of unions or of individual members thereof." *Id.* Bar Comm. Cmts.-1967 (West 2018). The comments further note that "[t]he labor exemption should be read together with the provision of Section 4 which states that labor performed as an employee is not a 'service' within the meaning of Section 3 of the Act," with the effect being that "[t]he Act [is] inapplicable to agreements by either labor or nonlabor groups insofar as they relate to restraint of competition concerning labor itself. The Act thus protects both management and labor in bargaining collectively over terms and conditions of employment." *Id.*

¶ 17    The Agency Defendants attempt to broaden this exception by arguing that it includes conduct "related to labor services." But they provide no specific definition for the term "labor services" or its limits, and their attempt to draw in their alleged conduct as being "related to" labor has no basis in the Act's provisions. The Act merely provides that individual labor is not a service,

so that otherwise anticompetitive action restraining individual labor is permissible. It does not provide that the exemption extends to services like those provided by staffing agencies that are "related to" labor, whatever that may mean.

¶ 18    The Agency Defendants point to federal court cases purportedly reaching a different conclusion, but we find those cases unhelpful to the Agency Defendants' position. The primary case upon which they rely is *O'Regan v. Arbitration Forums, Inc.*, 121 F.3d 1060 (7th Cir. 1997). There, an employee was terminated for refusing to sign a noncompetition agreement. *Id.* at 1063. She brought both federal and Illinois antitrust claims against her former employer, arguing that the noncompetition agreement "restrained trade by binding employees." *Id.* at 1065. The Seventh Circuit held that the employee lacked standing to bring her state-law claim, stating, without any further explanation, "to the extent [the employee's] claims relate to an *alleged market for labor services*, they are specifically excluded by § 10/4 of the Act, which states that ' "[s]ervice" shall not be deemed to include labor which is performed by natural persons as employees of others.' " *Id.* at 1066 (emphasis added).

¶ 19    The Agency Defendants appear to latch onto this use of the term "labor services" and attempt to position their work within it. However, the context of *O'Regan* makes clear that the "labor services" at issue in that case was not the type of labor services that the Agency Defendants provide. *O'Regan* concerned an employer's attempt to restrain an employee's individual labor through a noncompetition agreement. Thus, the "alleged market for labor services" that was the target of the alleged anticompetitive conduct in *O'Regan* was the market for the employee's own individual labor. Accordingly, *O'Regan*'s holding that a former employee could not bring an Illinois antitrust claim related to an alleged restraint on her individual labor is entirely consistent

with our reading of the plain language of section 4's second definition of "service" as allowing such a restraint, and it does not support the Agency Defendants' position that the labor addressed in section 4 extends to the services they provide.

¶ 20    The Agency Defendants also cite *Deslandes v. McDonald's USA, LLC*, 17 C 4857, 2018 WL 3105955 (N.D. Ill. June 25, 2018), which concerned an agreement between McDonald's stores not to hire each other's employees. *Id.* at *2–3. An employee who was barred from transferring between franchises brought claims under the Act, asserting that the no-hire agreements artificially suppressed her wage. *Id.* at *8–9. The district court affirmed the denial of her claims, citing *O'Regan* for the proposition that the Act excludes claims related to a market for labor services. *Id.* at *9. However, as in *O'Regan*, the so-called "labor services" that were allegedly restrained in *Deslandes* were the employee's own individual labor, a different type of would-be service than the hiring and managing services provided by temporary staffing agencies.

¶ 21    The *Deslandes* court also seemingly suggested that the labor referenced in section 4 of the Act is different from the labor exception contained in section 5, stating, "[a]lthough plaintiff suggests [that the exclusion of labor from the definition of "service" in section 4] is merely an exception for collective bargaining, the statute includes a separate labor exemption." *Id.* As did the circuit court, we find this limited analysis unpersuasive, and we disagree with the *Deslandes* court's apparent conclusion that the labor exception in section 5 and the exclusion of labor from the definition of "service" in section 4 must have different purposes. To the contrary, they are consistent with each other, and lawmakers are entitled to take a "belt and suspenders" approach to legislative drafting and cover the same issue in more than one place to avoid potential confusion over a possible conflict between the provisions. *Cf. Hively v. Ivy Tech Community College of*

*Indiana*, 853 F.3d 339, 344 (7th Cir. 2017) (recognizing that "Congress may certainly choose to use both a belt and suspenders to achieve its objectives"). Indeed, the Bar Committee Comments to section 5 expressly observe that the labor provisions of sections 4 and 5 should be read together. See 740 ILCS 10/5 Bar Comm. Cmts.-1967 (West 2018).

¶ 22    Thus, contrary to the Agency Defendants' arguments, the exclusion of labor from the definition of "service" in section 4 is primarily concerned with restraints on the individual labor of natural persons for the purpose of allowing employees and management to engage in collective bargaining and related activities. We do not see any language in the Act extending that protection to the hiring and managing services provided by temporary staffing agencies, which are not natural persons performing labor for an employer.[2]

¶ 23    Therefore, we answer the first certified question by holding that, to the extent that the alleged unlawful conduct concerns restraints that they place on their own services (*i.e.*, recruiting, hiring, and managing temporary employees) and do not concern restraints on a natural person's individual labor, temporary staffing agencies like the Agency Defendants in this case are subject to the Act's provisions, and in particular section 3's prohibitions on anticompetitive restraints on services.

¶ 24    We turn, then, to the second certified question: "Whether the *per se* rule under Section 3(1) of the [Act], 740 ILCS 10/3(1), which states that it applies to conspiracies among 'competitor[s],' extends to alleged horizontal agreements facilitated by a vertical noncompetitor." We believe that

---

[2] We note that our comments on this issue should not be read to express an opinion that collective bargaining and related conduct are the *only* types of activities covered by the exclusion of individual labor from the definition of "service" in section 4 of the Act. That issue is not before us. Rather, our opinion in this case is limited to that provision's inapplicability to the type of services provided by temporary staffing agencies.

the answer to that question is that it depends not on the presence of a vertically situated party, but rather on the nature of the agreement and the conduct at issue. Even when there is a vertical element to an otherwise horizontal agreement, such an agreement can receive *per se* treatment when it is a naked anticompetitive conspiracy. However, it should be examined under the rule of reason when the conduct at issue is ancillary to a legitimate procompetitive agreement.

¶ 25    Unlike the first certified question, the plain language of the Act does not clearly provide an answer to this question. The provision at issue is subsection 3(1) of the Act, which makes it unlawful to "[m]ake any contract with, or engage in any combination or conspiracy with, any other person who is, or but for a prior agreement would be, a competitor of such person" for delineated anticompetitive purposes or with particular anticompetitive effects. 740 ILCS 10/3(1) (West 2018). Violations of this subsection are commonly referred to as "*per se*" offenses and are "deemed to constitute the most serious restraints upon competition." *Id.* Bar Comm. Cmts.-1967. "The conduct proscribed by Section 3(1) is violative of the Act without regard to, and the courts need not examine, the competitive and economic purposes and consequences of such conduct." *Id.* As a general matter, subsection 3(1) is only applied to horizontal agreements between competitors and "does not reach vertical agreements, such as agreements between buyers and sellers fixing the price at which the buyer shall resell." *Id.*

¶ 26    The State in this case brings both of its claims against the defendants under subsection 3(1), alleging two horizontal agreements constituting *per se* violations of the Act. However, the defendants contend that their alleged no-poaching and wage-fixing agreements are not purely horizontal in nature and instead contain a vertical element, removing them from consideration under subsection 3(1), which only applies to agreements with a "competitor." Instead, they argue

that the State's claims must be considered under subsection 3(2) of the Act (740 ILCS 10/3(2) (West 2018)).[3]

¶ 27    Subsection 3(2) more generally prohibits "one or more other persons" from "unreasonably restrain[ing] trade or commerce." 740 ILCS 10/3(2) (West 2018). Rather than applying a *per se* approach, subsection 3(2) uses the "rule of reason" to "examine the competitive and economic purposes and consequences of such arrangements for the purpose of determining whether or not trade or commerce has been unreasonably restrained." *Id.* Bar Comm. Cmts.-1967.

¶ 28    While Illinois courts have not yet weighed in on the question presented, the supreme court has noted that subsection 3(1) of the Act is "patterned after section 1 of the Sherman Act * * * , and in our construction of the Illinois Antitrust Act we are guided by Federal case law construing analogous provisions of Federal legislation." *People ex rel. Scott v. College Hills Corp.*, 91 Ill. 2d 138, 150 (1982) (citations omitted); see also 740 ILCS 10/11 (West 2018) ("When the wording of this Act is identical or similar to that of a federal antitrust law, the courts of this State shall use the construction of the federal law by the federal courts as a guide in construing this Act."); *Baker v. Jewel Food Stores, Inc.*, 355 Ill. App. 3d 62, 69 (1st Dist. 2005) ("Section 3(1) is patterned after section 1 of the Sherman Act."). We therefore take instruction from federal court decisions to the extent that they are consistent with the Act's provisions.

¶ 29    An analysis of this issue begins with a preliminary determination of the type of restraint at issue as either horizontal or vertical. "A horizontal restraint is 'an agreement among competitors on the way in which they will compete with one another.' " *Aya Healthcare Services, Inc. v. AMN*

---

[3] In its separate brief, Colony argues that for the same reason it should be dismissed from this case. However, that issue is beyond the scope of the questions presented, so we will not address it.

*Healthcare, Inc.*, 9 F.4th 1102, 1108 (9th Cir. 2021) (quoting *NCAA v. Board of Regents*, 468 U.S. 85, 99 (1984)). "Vertical restraints are 'restraints imposed by agreement between firms at different levels of distribution.' " *Id.* (quoting *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2284 (2018)). The Agency Defendants contend that Colony's involvement in and facilitation of the alleged conspiracies renders the agreements vertical in nature, or at least removes the alleged conspiracies from the *per se* category. However, the analysis of this issue is nuanced, and the classification ultimately depends on the conduct at issue.

¶ 30    Federal case law makes clear that a vertical party's coordination of a horizontal restraint among competitors does not necessarily transform the otherwise horizontal restraint into a vertical one. In *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928 (7th Cir. 2000), toy retailer Toys "R" Us ("TRU") orchestrated an agreement among its largest manufacturers to restrict the distribution of their products to warehouse clubs that were competing against TRU. *Id.* at 930. The Seventh Circuit held that, even though the conspiracy consisted of a series of individual vertical agreements between each manufacturer and TRU, evidence that the manufacturers only agreed to TRU's desired restrictions on the condition that their competitors would do the same made the conspiracy horizontal in nature and allowed for a finding of a *per se* violation. *Id.* at 935–36. The key consideration was evidence of concerted anticompetitive behavior by competitors, regardless of the presence or participation of a vertical party. *Id.*; accord *United States v. Apple, Inc.*, 791 F.3d 290, 325 (2d Cir. 2015) (holding that a horizontal conspiracy existed despite the coordination and participation of a vertical party); *Denny's Marina, Inc. v. Renfro Productions, Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993) (holding that the participation of a noncompetitor did not transform a horizontal price-fixing agreement among competitors into a vertical agreement). Thus, the

defendants' contention that a vertical party's involvement necessarily precludes application of *per se* review is incorrect.

¶ 31    However, while horizontal restraints are typically analyzed under the *per se* standard (*Aya Healthcare*, 9 F.4th at 1109) that is not always the case. "Under the 'ancillary restraints' doctrine, a horizontal agreement is 'exempt from the *per se* rule,' and analyzed under the rule-of-reason, if it meets two requirements." *Id.* (quoting *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986)).

>  "These requirements are that the restraint must be (1) 'subordinate and collateral to a separate, legitimate transaction,' *Rothery Storage*, 792 F.2d at 224, and (2) 'reasonably necessary' to achieving that transaction's pro-competitive purpose, *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 281 (6th Cir. 1898), *aff'd*, 175 U.S. 211, 20 S. Ct. 96, 44 L.Ed. 136 (1899); see also [*L.A. Memorial Coliseum Commission v. National Football League*, 726 F.2d 1381, 1395 (9th Cir. 1984)] ('[T]he doctrine teaches that some agreements which restrain competition may be valid if they are "subordinate and collateral to another legitimate transaction and necessary to make that transaction effective." ' (citation omitted)).

>  'Naked restraints' are categorically not 'ancillary restraints.' *Rothery Storage*, 792 F.2d at 224 n.10. Thus, naked horizontal restraints are always analyzed under the *per se* standard. A restraint is naked if it has 'no purpose except stifling of competition.' *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S. Ct. 696, 9 L.Ed.2d 738 (1963). Some examples of these restraints include agreements among actual or potential competitors to fix prices, *e.g.*, *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647, 100 S. Ct. 1925, 64

L.Ed.2d 580 (1980) (per curiam); rig bids, *e.g.*, [*United States v. Joyce*, 895 F.3d 673, 677 (9th Cir. 2018)]; or divide markets, *e.g.*, *Palmer v. BRG of Georgia., Inc.*, 498 U.S. 46, 49– 50, 111 S. Ct. 401, 112 L.Ed.2d 349 (1990) (per curiam)."

*Aya Healthcare*, 9 F.4th at 1109.

¶ 32    *Aya Healthcare* provides an example of the type of horizontal restraint that should receive rule-of-reason consideration. There, a temporary staffing company, AMN Healthcare, Inc., was struggling to provide enough labor to meets its clients' needs. *Id.* at 1106. To help satisfy that demand, it contracted with other staffing companies, including Aya Healthcare Services, Inc., to provide additional labor. *Id.* AMN's contract with Aya prohibited Aya from soliciting AMN's employees. *Id.* When Aya broke that covenant and began soliciting AMN's employees, the parties ended their relationship, and Aya then sued AMN for antitrust violations. *Id.*

¶ 33    After first finding that the parties' contract was a horizontal agreement between would-be competitors, the Ninth Circuit explained that "the threshold question on appeal is whether the restraint in this case is naked or ancillary, and in turn, whether it is *per se* unlawful or subject to the rule-of-reason, respectively." *Id.* at 1109. The court concluded that the non-solicitation restraint was ancillary because it was "reasonably necessary to the parties' procompetitive collaboration. The purpose of the parties' contract was to supply hospitals with traveling nurses. The non–solicitation agreement is necessary to achieving that end because it ensures that AMN will not lose its personnel during the collaboration." *Id.* at 1110. The court further explained, "[t]he non-solicitation agreement * * * promotes 'competitiveness in the healthcare staffing industry'—more hospitals receive more traveling nurses because the non-solicitation agreement allows AMN to give spillover assignments to Aya without endangering its 'establish[ed] network[] [of] recruiters,

travel nurses, AVs, and of course, hospital customers.' " *Id.* (ellipses added, brackets in original) (quoting *Aya Healthcare Services, Inc. v. AMN Healthcare, Inc.*, --- F. Supp. 3d ----, ----, 2020 WL 2553181, at *1 (S.D. Cal. May 20, 2020)). The court therefore concluded that the restraint was ancillary in nature and reviewed under the rule of reason. *Id.*

¶ 34    With this guidance, we return to the circuit court's second certified question: "Whether the *per se* rule under Section 3(1) of the [Act], 740 ILCS 10/3(1), which states that it applies to conspiracies among 'competitor[s],' extends to alleged horizontal agreements facilitated by a vertical noncompetitor." We answer this question by holding that the classification of a conspiracy as horizontal or vertical is not determined by the presence of a vertically situated party, but rather by the existence or absence of concerted horizontal action, and whether the *per se* rule applies to such a horizontal conspiracy depends on whether the restraint at issue is naked or ancillary, with *per se* consideration given to the former and the rule of reason applied to the latter.

¶ 35    Certified questions answered; cause remanded.

| | |
|---|---|
| **No. 1-21-0840** | |

| | |
|---|---|
| **Cite as:** | The State of Illinois, by the Attorney General, Kwame Raoul, Plaintiff-Appellee v. Elite Staffing, Inc., Metro Staff, Inc., Midway Staffing, Inc. and Colony Display, LLC, Defendants-Appellants. |

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 20 CH 5156 Honorable Raymond Mitchell, Judge, presiding. |

**Appellants Attorneys:**

MCGUIREWOODS LLP
Amy B. Manning
77 West Wacker
Suite 4100
Chicago, Illinois 60601
Telephone: (312) 849-8100
Attorneys for Elite Staffing

SMITHAMUNDSEN LLC
John R. Hayes
150 N. Michigan Avenue
Suite 3300
Chicago, Illinois 60601
Telephone: (312) 894-3200  Firm
Attorneys for Midway Staffing

The Fish Law Firm
David J. Fish
200 E. 5th Ave
Suite 123
Naperville, Illinois 60563
Telephone: (630) 355-7590
Attorneys for Metro Staff

Scott Mendelhoff, Gabriel Aizenberg, David S. Repking, Brian D. Straw
Greenburg Taurig LLP,
77 W. Wacker Dr., Suite 3100
Chicago, IL 60601
Telephone: (312) 456-8400
Attorneys for Colony Display LLC

John J. Cullerton Patrick Morales-Doyle Thompson Coburn LLP 55 East Monroe Street, 37th Floor Chicago, Illinois 60603 Telephone No.: 312.346.7500 – Amicus Brief for Staffing Services Association of Illinois

Eric A. Posner 5611 S. Blackstone Ave. Chicago, Illinois 60637 Telephone No.: 773-633-3834 – Amicus Brief for Eric A. Posner

Ada Sandoval  Mark H. Birhanu Legal Department Raise the Floor Alliance 1 N. LaSalle Street, Suite 1275 Chicago, IL 60602 (312) 795-9115 – Amicus Brief for Raise the Floor Alliance

**Attorneys for Appellee:**
KWAME RAOUL Attorney General State of Illinois; Priyanka Gupta PRIYANKA GUPTA Assistant Attorney General 100 West Randolph Street 12th Floor Chicago, Illinois 60601 (312) 814-2109 (

llee Attorney: