**2024 IL 128763**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

(Docket No. 128763)

THE STATE OF ILLINOIS *ex rel.* KWAME RAOUL, Attorney General, Appellee, v. ELITE STAFFING, INC., *et al.*, Appellants.

*Opinion filed January 19, 2024.*

JUSTICE NEVILLE delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Overstreet, Holder White, Rochford, and O'Brien concurred in the judgment and opinion.

Justice Cunningham took no part in the decision.

## OPINION

¶ 1 The State of Illinois filed a complaint in which it alleged Elite Staffing, Inc., Metro Staff, Inc., and Midway Staffing, Inc. (collectively, the staffing agencies), violated the Illinois Antitrust Act. 740 ILCS 10/3 (West 2018). The staffing agencies filed a motion to dismiss the complaint, claiming that the act did not apply

to the charged conduct. The circuit court of Cook County denied the motion but certified for interlocutory review two questions about the reach of the act:

"1. Whether the definition of 'Service' under Section 4 of the Illinois Antitrust Act, 740 ILCS 10/4, which states that Service 'shall not be deemed to include labor which is performed by natural persons as employees of others,' applies to the Illinois Antitrust Act as a whole and thus excludes all labor services from the Illinois Antitrust Act's coverage.

2. Whether the *per se* rule under Section 3(1) of the Illinois Antitrust Act, 740 ILCS 10/3(1), which states that it applies to conspiracies among 'competitor[s],' extends to alleged horizontal agreements facilitated by a vertical noncompetitor."

The appellate court answered the second question, but instead of answering question 1, it answered a different question:

"whether the exclusion of individual labor from the definition of 'service' in section 4 of the [Illinois Antitrust Act] also excludes the labor-related services provided by temporary staffing agencies and therefore exempts such agencies from [its] coverage." 2022 IL App (1st) 210840, ¶ 11.

¶ 2        We granted the staffing agencies' petition for leave to appeal from the appellate court decision. Ill. S. Ct. R. 315 (a) (eff. Oct. 1, 2021).

¶ 3        We hold that the Illinois Antitrust Act does not exempt from antitrust scrutiny all agreements between competitors to hold down wages and to limit employment opportunities for their employees. We vacate the appellate court's answer to the question it formulated, answer the circuit court's first certified question, do not address the second certified question because the parties have not sought our review of that question and its answer, and remand for further proceedings.

¶ 4                                     I. BACKGROUND

¶ 5        The State alleged in its complaint that Colony Display (Colony) hired the staffing agencies to supply the temporary workers it needed. Colony, which installs fixtures and displays for home improvement and retail businesses, relies heavily on

temporary workers, who form the majority of Colony's workforce. 2022 IL App (1st) 210840, ¶ 3. At Colony's request, the State alleged, the staffing agencies agreed to fix the wages for their employees who worked for Colony at below-market rates, and they agreed not to hire each other's employees. *Id.* ¶¶ 5-6. Colony helped the staffing agencies enforce their agreement. *Id.* The State claimed the alleged conduct constituted an agreement between competitors to fix the price paid for services and therefore that it had violated section 3(1)(a) of the Illinois Antitrust Act (740 ILCS 10/3(1) (West 2018)). 2022 IL App (1st) 210840, ¶ 12. The defendants filed a motion to dismiss the complaint under section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2018)), claiming that the complaint did not state a cause of action because the Illinois Antitrust Act provides that services otherwise subject to the act "shall not be deemed to include labor which is performed by natural persons as employees of others" (740 ILCS 10/4 (West 2018)). 2022 IL App (1st) 210840, ¶ 7.

¶ 6    The circuit court denied the motion but certified for interlocutory review the following issue:

   " 'Whether the definition of "Service" under Section 4 of the Illinois Antitrust Act, 740 ILCS 10/4, which states that Service "shall not be deemed to include labor which is performed by natural persons as employees of others," applies to the Illinois Antitrust Act as a whole and thus excludes all labor services from the Illinois Antitrust Act's coverage.' " *Id.* ¶ 1.

¶ 7    The parties have not asked this court to address in this appeal the second question the circuit court certified for interlocutory review. See *id.*

¶ 8                              A. Appellate Court

¶ 9    The appellate court found first that the question as phrased relied on an incorrect assumption that, if the definition of "service" applied to the Illinois Antitrust Act as a whole, it exempts all labor services from the act's coverage. *Id.* ¶ 11. The appellate court restated the question and addressed instead the issue of "whether the exclusion of individual labor from the definition of 'service' in section 4 of the [Illinois Antitrust Act] also excludes the labor-related services provided by

temporary staffing agencies and therefore exempts such agencies from [its] coverage." *Id.*

¶ 10 The appellate court found that the legislature narrowed the definition of service "to allow individuals to engage in otherwise anticompetitive behavior regarding their own labor by participating in collective bargaining and related conduct." *Id.* ¶ 15. The appellate court found the exemption of section 4 did not extend to services provided by staffing agencies. The court held:

"[T]o the extent that the alleged unlawful conduct concerns restraints that they place on their own services (*i.e.*, recruiting, hiring, and managing temporary employees) and do not concern restraints on a natural person's individual labor, temporary staffing agencies like the Agency Defendants in this case are subject to the Act's provisions and, in particular, section 3's prohibitions on anticompetitive restraints on services." *Id.* ¶ 23.

¶ 11 This court granted the agencies' petition for leave to appeal. Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2021). We accepted briefs *amici curiae* from (1) the United States Department of Justice in support of the State's position; (2) Raise the Floor Alliance, National Legal Advocacy Network, and National Employment Law Project in support of the State's position; and (3) Staffing Services Association of Illinois and American Staffing Association in support of the staffing agencies' position. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 12                                          II. ANALYSIS

¶ 13 Rule 315 gives this court jurisdiction over the appeal. Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2021); *Moore v. Chicago Park District,* 2012 IL 112788, ¶ 7. Illinois courts usually limit review under Rule 308 (Ill. S. Ct. R. 308 (eff. Oct. 1, 2019)) to answering the certified question, unless the question rests on an erroneous legal assumption. *De Bouse v. Bayer AG*, 235 Ill. 2d 544, 550, 557 (2009).

¶ 14 Both parties ask this court to answer the question certified by the circuit court rather than the question the appellate court answered. We do not interpret the circuit court's question as incorrectly assuming that, if the definition of service applies to the Illinois Antitrust Act as a whole, the act necessarily excludes all labor services

from its coverage. Rather, we find that the question the circuit court certified asked the appellate court to decide whether the Illinois Antitrust Act excludes from its coverage all agreements concerning labor services. We will answer the circuit court's certified question.

¶ 15     On certified question review, this court should address only issues of law and not the application of the law to the particular facts of the case. *Rozsavolgyi v. City of Aurora*, 2017 IL 121048, ¶ 21. We review *de novo* rulings on the interpretation of a statute. *Midwest Sanitary Service, Inc. v. Sandberg, Phoenix & Von Gontard, P.C.*, 2022 IL 127327, ¶ 19.

¶ 16     We apply familiar principles of statutory interpretation. "The most fundamental rule in statutory construction is to give effect to the legislative intent." *Murray v. Chicago Youth Center*, 224 Ill. 2d 213, 235 (2007). "The statutory language, given its plain and ordinary meaning, is generally the most reliable indicator of that legislative intent, but a literal reading must fail if it yields absurd, inconvenient, or unjust results." *Cassidy v. China Vitamins*, *LLC*, 2018 IL 122873, ¶ 17.

> "Words and phrases should not be considered in isolation; rather, they must be interpreted in light of other relevant provisions and the statute as a whole. [Citations.] In addition to the statutory language, the court may consider the purpose behind the law and the evils sought to be remedied, as well as the consequences that would result from construing the law one way or the other." *County of Du Page v. Illinois Labor Relations Board*, 231 Ill. 2d 593, 604 (2008).

¶ 17                          A. The Statutes at Issue

¶ 18     We must interpret five sections of the Illinois Antitrust Act: sections 2, 3, 4, 5, and 11 (740 ILCS 10/2, 3, 4, 5, 11 (West 2018)). Section 2 states that the legislature adopted the act

> "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade, whether in

manufacturing, distribution, financing, and service industries or in related for-profit pursuits." *Id.* § 2.

¶ 19   Section 3 provides:

"Every person shall be deemed to have committed a violation of this Act who shall:

(1) Make any contract with, or engage in any combination or conspiracy with, any other person who is, or but for a prior agreement would be, a competitor of such person:

a. for the purpose or with the effect of fixing, controlling, or maintaining the *** fee charged or paid for any service performed or received by the parties thereto; [or]

b. fixing, controlling, maintaining, [or] limiting *** the sale or supply of any service, for the purpose or with the effect stated in paragraph a. of subsection (1)[.]" *Id.* § 3.

¶ 20   Section 4 defines "service" as follows:

" 'Service' shall mean any activity, not covered by the definition of 'commodity,' which is performed in whole or in part for the purpose of financial gain.
'Service' shall not be deemed to include labor which is performed by natural persons as employees of others." *Id.* § 4.

¶ 21   Section 5 makes an exception to the broad reach of section 3:

"No provisions of this Act shall be construed to make illegal:

(1) the activities of any labor organization or of individual members thereof which are directed solely to labor objectives which are legitimate under the laws of either the State of Illinois or the United States." *Id.* § 5.

¶ 22   Section 11 guides the interpretation of the Illinois Antitrust Act:

"When the wording of this Act is identical or similar to that of a federal antitrust law, the courts of this State shall use the construction of the federal law by the federal courts as a guide in construing this Act." *Id.* § 11.

¶ 23    This court has explained that, where the language of federal antitrust statutes differs markedly from the Illinois Antitrust Act, "we must consider whether, given the differences between section 3[ ] and [the federal statute], the reasoning employed by the Federal courts in interpreting [the federal statute] is relevant to our interpretation of section 3[ ]." *Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*, 162 Ill. 2d 99, 104 (1994).

¶ 24    Because of section 11, we must also consult federal antitrust statutes. Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1 (2018).

¶ 25    Finally, the Clayton Act provides:

"The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws." *Id.* § 17.

¶ 26                            B. Section 3 of the Illinois Antitrust Act

¶ 27    The General Assembly patterned section 3(1)(a) of the Illinois Antitrust Act after section 1 of the Sherman Act. *People ex rel. Scott v. College Hills Corp.*, 91 Ill. 2d 138, 150 (1982) ("Section 3(1)(a) is patterned after section 1 of the Sherman Act [citation], and in our construction of the Illinois Antitrust Act we are guided by Federal case law construing analogous provisions of Federal legislation

[citation]."). The United States Supreme Court succinctly summarized one significant problem courts encounter when interpreting the Sherman Act:

"[Section] 1 of the Sherman Act *** cannot mean what it says. The statute says that 'every' contract that restrains trade is unlawful. But, as Mr. Justice Brandeis perceptively noted, restraint is the very essence of every contract; read literally, [section] 1 would outlaw the entire body of private contract law." *National Society of Professional Engineers v. United States*, 435 U.S. 679, 687-88 (1978).

To avoid the absurd consequences of applying the Sherman Act literally, " 'courts have construed it as precluding only those contracts or combinations which "unreasonably" restrain competition.' " *Williams v. St. Joseph Hospital*, 629 F.2d 448, 452 (7th Cir. 1980) (quoting *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5 (1958)). For many restraints of trade, federal courts adopted "rule of reason" analysis, under which the "trial court must perform a market share analysis to determine whether the defendant possessed monopoly power in the relevant market. *** [T]he plaintiff must show that the defendant possessed sufficient monopoly power to inflict competitive injury in the relevant market." *Gilbert's Ethan Allen Gallery*, 162 Ill. 2d at 102-03.

¶ 28    Some agreements "are so plainly anticompetitive [citation] that they are conclusively presumed illegal without further examination under the rule of reason generally applied in Sherman Act cases." (Internal quotation marks omitted.) *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 8 (1979). " 'If a practice is within the per se category, all you have to prove to establish a violation is that the defendant engaged in the practice; you do not have to show that in fact the practice has had or will have an adverse effect on competition.' " *Gilbert's Ethan Allen Gallery*, 162 Ill. 2d at 105 (quoting *Marrese v. American Academy of Orthopaedic Surgeons*, 692 F.2d 1083, 1093 (7th Cir. 1982). "[A]greements among competitors to fix prices on their individual goods or services are among those concerted activities that the Court has held to be within the *per se* category." *Broadcast Music*, 441 U.S. at 8.

¶ 29    The complaint here alleges that competitors, the staffing agencies, agreed to fix the wages they would pay to their employees sent to work for Colony. The alleged agreement falls squarely within the realm of conduct so clearly anticompetitive that

it violates antitrust laws without further examination under the rule of reason. See *id.*; *Quinonez v. National Ass'n of Securities Dealers, Inc.*, 540 F.2d 824, 828-29 (5th Cir. 1976).

¶ 30 Applying federal standards (see *Laughlin v. Evanston Hospital*, 133 Ill. 2d 374, 383-84 (1990)), we find that a multiemployer agreement to restrict wages and not to hire each other's employees violates section 3 of the Illinois Antitrust Act unless section 4 of the act exempts the alleged agreement from the coverage of the act.

¶ 31 C. Section 4 of the Illinois Antitrust Act

¶ 32 Considered in isolation, section 4, which exempts from the Illinois Antitrust Act's coverage "labor which is performed by natural persons as employees of others" (740 ILCS 10/4 (West 2018)), appears to exempt from antitrust scrutiny all agreements concerning wages and conditions of employment, regardless of their anticompetitive effects. But if we construe the definition so broadly, it conflicts with the stated purpose of the act, which the legislature designed

"to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade, whether in manufacturing, distribution, financing, and service industries or in related for-profit pursuits." *Id.* § 2.

¶ 33 Just as the broad language of the Sherman Act conflicted with its purpose and led to absurd results, the broad language of the definition in section 4 conflicts with the purpose of the Illinois Antitrust Act. We find section 4's definition of services, when considered in the context of the act as a whole, ambiguous because of the conflict between the apparent reach of the exemption on superficial examination and the purpose of the act. When we encounter ambiguity in a statute considered as a whole, we turn to tools of interpretation to help us determine the meaning of a statute. *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59 (2006) ("if the language of a statute is ambiguous, courts may look to tools of interpretation to ascertain the meaning of a provision").

¶ 34    "Where the mind labours to discover the design of the legislature, it seizes every thing from which aid can be derived." *United States v. Fisher*, 6 U.S. (2 Cranch) 358, 386 (1805). "When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no rule of law which forbids its use, however clear the words may appear on superficial examination." (Internal quotation marks omitted.) *United States v. American Trucking Ass'ns*, 310 U.S. 534, 543-44 (1940).

¶ 35    We have a commentary on the Illinois Antitrust Act prepared by the drafters, the Chicago Bar Association's Committee on Antitrust Law (Committee). The Committee prepared the commentary in 1967, two years after the legislature enacted the Illinois Antitrust Act. This court has used the commentary as an aid to interpreting the act. See *Laughlin*, 133 Ill. 2d at 386-87; *Gilbert's Ethan Allen Gallery*, 162 Ill. 2d at 106. State archives list the sponsors of the bill that became the Illinois Antitrust Act and the proponents and opponents of the bill. One of the bill's proponents, Professor James Rahl, wrote an article in which he argued the states should enact their own antitrust statutes because not all pernicious price fixing agreements and other antitrust violations affect interstate commerce. James A. Rahl, *Toward a Worthwhile State Antitrust Policy*, 39 Tex. L. Rev. 753, 758 (1961) (*State Antitrust*). Because Rahl appeared before the legislature as a proponent of the bill the legislature enacted, we find that his article qualifies as some evidence concerning the intent of the legislation. William N. Eskridge Jr., *The New Textualism*, 37 UCLA L. Rev. 621, 636 (1990) (comments of nonlegislator drafters constitute some evidence of legislative intent). We also have some evidence of legislative inaction and an argument concerning the effect of subsequent legislation.

¶ 36    Because section 11 of the Illinois Antitrust Act directs our attention to federal law, we start with a discussion of decisions interpreting federal antitrust law, followed by discussions of the committee comments, Rahl's views, and legislative inaction. Finally, we respond to an argument raised by *amici* supporting the staffing agencies' position, who claim that a statute immunizes staffing agencies from all antitrust laws.

¶ 37                                    1. Federal Antitrust Law

¶ 38    The Clayton Act provides, "The labor of a human being is not a commodity or article of commerce." 15 U.S.C. § 17 (2018). Employers have sought to use the provision to exempt from antitrust scrutiny anticompetitive agreements similar to the agreement alleged in the State's complaint here.

¶ 39    In *Roman v. Cessna Aircraft Co.*, 55 F.3d 542, 543 (10th Cir. 1995), Roman alleged that several airplane manufacturers agreed not to hire each other's employees. He alleged that one of the manufacturers would have hired him and paid him a higher salary if not for the agreement. *Id.* The *Roman* court found that Roman stated a cause of action for violation of federal antitrust law. *Id.* at 545. The court adopted the following explanation from a treatise on antitrust law:

> " 'Antitrust law addresses employer conspiracies controlling employment terms precisely because they tamper with the employment market and thereby impair the opportunities of those who sell their services there. Just as antitrust law seeks to preserve the free market opportunities of buyers and sellers of goods, so also it seeks to do the same for buyers and sellers of employment services. ***
>
> Thus, the courts have readily approved standing for professional athletes challenging agreements among employers fixing employment terms and for brokers or magazine solicitors challenging their employers' agreements against hiring switching employees.' " *Id.* at 544 (quoting II Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 377c (rev. ed. 1995)).

¶ 40    Both parties cite *Cordova v. Bache & Co.*, 321 F. Supp. 600 (S.D.N.Y. 1970), in support of their arguments. In *Cordova*, securities representatives alleged that their employers, stock brokerage firms, conspired to reduce the commissions paid to securities representatives for the sale of stock. *Id.* at 603. The brokerage firms, like the staffing agencies here, argued that the complaint did not allege a violation of antitrust law. *Id.* at 605. According to the brokerage firms, a "conspiracy on the part of employers with respect to the labor of their employees" cannot violate federal antitrust law because " '[t]he labor of a human being is not a commodity or article of commerce.' " *Id.* (quoting 15 U.S.C. § 17 (1970)).

¶ 41    The *Cordova* court held:

"If the language of *** the Clayton Act stopped with the sentence quoted by defendants, it would lend support to their position. It is immediately followed, however, by additional language which when considered in the light of the statute's legislative history, convinces us that the sole purpose and effect of the section is to exempt activities and agreements on the part of labor, agricultural or horticultural organizations with respect to their furnishing labor in the market place. ***

* * *

It is readily apparent that Congress *** was concerned with the right of labor and similar organizations to continue engaging in such activities, including that right to strike, not with the right of employers to ban[d] together for joint action in fixing the wages to be paid by each employer. There is no evidence of the existence of any necessity to protect the latter type of activity ***." *Id.* at 605-06.

¶ 42 The court surveyed the extensive legislative history of the federal antitrust statutes and concluded:

"Congress' only purpose *** was to help the labor organizations and the labor movement by removing any doubt as to the legality of their existence and operations. ***

***

There can be little doubt about the fact that if a group of employers, as the complaint here alleges, were allowed, not as part of a collective bargaining agreement, to agree together to reduce the commissions paid to their respective employees, they would have the same power to restrain competition as is inherent in a price-fixing agreement. *** The effect of such a unilateral agreement between employers, as alleged in the present complaint (citation), could also be to restrain mobility on the part of employees who would otherwise have the opportunity, in a competitive market for services, to transfer to higher paid opportunities offered by other[s]. *** [A]n agreement between employers would enable the employers together to achieve what no single one of them could do alone.

*** [A]n essential prerequisite to the legality of such multiemployer combinations with respect to industry-wide wages or working conditions is the existence or prospect of a joint collective bargaining agreement with the union, which all parties concede to be immune from the antitrust laws. The exemption granted to such agreements extends to joint-employer action reasonably related or incident to them. Absent such conditions, however, a combination of employers to reduce their employees' compensation does not share labor's exemption." *Id.* at 606-07.

¶ 43                                    2. Bar Committee Comments

¶ 44          The bar commentary explains that the Illinois Antitrust Act, "[i]n the main, *** is the same as a bill drafted by the Committee on Antitrust Law of the Chicago Bar Association." 740 ILCS Ann. art. 10, Committee Comments-1967, at 12 (Smith-Hurd 2010). The committee prepared the commentary "to memorialize the intentions of the draftsmen as to the meaning of the language of the Act, and to offer guidance to the courts and the bar in the interpretation of the law." *Id.*

¶ 45          The commentary first explains the need for "effective antitrust enforcement at the state level" (*id.* at 13) and adds that the drafters intended "to provide an effective means of combating the serious damage which is done to the free enterprise system in Illinois by groups who substitute self-designed schemes of private business regulation for the impersonal direction of the free market" (*id.* at 14). According to the commentary, section 3(1)(a)

"is designed to reach the 'hard core' conspiratorial offenses of price fixing, limitations on production, and allocation of markets or customers. ***

Section 3(1)(a) proscribes agreements between competitors, the purpose or effect of which is to fix, control, or maintain *** the prices which they will pay for the commodities or services which they buy." *Id.* § 3, Committee Comments-1967, at 19-20.

¶ 46          The brief commentary on section 4 addresses the definition of service:

"[T]he definitions of Section 4 were expressly designed to make services and real estate subject to the prohibitions of the law. It was the feeling of the draftsmen that exemptions should be strictly limited and that almost all service occupations should be within the reach of the statute. In this connection see the discussion, *infra*, with relation to Section 5 on exemptions generally." *Id.* § 4, Committee Comments-1967, at 52.

¶ 47    The comment on section 5 elaborates:

"It was always understood by the draftsmen that exemptions would be accorded to labor unions, agricultural cooperatives, and public utilities. *** [I]t was believed necessary to adopt an approach similar to that used for the federal exemptions on those subjects, thereby preserving general overall consistency.

The labor exemption in subsection (1), like that of *** the Clayton Act, prevents the application of the Antitrust Act to legitimate labor objectives and activities of unions or of individual members thereof. The Illinois Act is more explicit than the Clayton Act, however, in limiting the exemption to activities which 'are directed solely to labor objectives which are legitimate under the laws of either the State of Illinois or the United States.' ***.

The labor exemption should be read together with the provision of Section 4 which states that labor performed as an employee is not a 'service' within the meaning of Section 3 of the Act. The effect of this provision is to make the Act inapplicable to agreements by either labor or nonlabor groups insofar as they relate to restraint of competition concerning labor itself. The Act thus protects both management and labor in bargaining collectively over terms and conditions of employment." *Id.* § 5, Committee Comments-1967, at 55.

¶ 48    We find the bar committee commentary shows the drafters intended to limit the exemption to legitimate labor union activity and agreements multiple employers reach in the course of collective negotiations with labor unions.

¶ 49                                3. Rahl's Proposal

¶ 50    In *State Antitrust*, Rahl proposed an antitrust act, and the proposal included the following definition:

" 'Service' shall mean any activity not covered by the definition of commodity, which is performed in whole or in part for the purpose of financial gain. 'Service' shall not include labor which is performed by persons as employees of others, but this exclusion is limited to conduct pertaining to such labor, and does not exclude from the operation of this Act agreements or acts by or with laborers or organizations of laborers concerning commodities and services covered by this Act." Rahl, *supra*, at 775.

¶ 51    Rahl explained:

"The draft *** [makes an] exclusion for labor in the definition of 'services.' *** [The exclusion] should be sufficient to protect the right of labor organizations to restrain and monopolize the terms and supply of the labor with which they are concerned, and hence to carry on the customary labor activities contemplated by present-day national labor policy. Incidentally, this approach would also remove from the act restraints as to labor imposed by non-labor groups, occurring in situations such as joint bargaining on the management side." *Id.* at 778.

¶ 52    Like the bar committee, Rahl emphasizes the need to exempt legitimate union activity from the reach of the Illinois Antitrust Act and the correlative exemption for agreements between employers in the course of negotiations with unions. No source concerning the purpose of antitrust laws suggests that the legislature meant to leave competing employers free to collude with each other to reduce the wages they pay to their employees or to collude to prevent workers from switching to better jobs.

¶ 53                           4. Legislative Inaction

¶ 54    The staffing agencies rely on two published federal cases and argue that the legislature's failure to amend the Illinois Antitrust Act after those decisions shows that the two decisions correctly interpreted Illinois law.

¶ 55    "Where the legislature chooses not to amend a statute after a judicial construction, it will be presumed that it has acquiesced in the court's statement of the legislative intent." *Miller v. Lockett*, 98 Ill. 2d 478, 483 (1983).

"[E]vidence of legislative silence and subsequent history is usually too ambiguous to count as legislative history, but in some contexts the sources are considered by the [United States Supreme] Court. *** Legislative silence will usually be supporting evidence of legislative intent and will be the main evidence only when there is virtually no other evidence of legislative intent." Eskridge, *supra*, at 640.

¶ 56    We find that the persuasive power of legislative silence depends on the circumstances of the legislative decision not to amend a statute following a judicial interpretation of the statute.

"It is an elementary rule of construction that where, after a statute has been construed by the highest court of the state, the Legislature re-enacts the statute, whether by the adoption of Revised Statutes or by amendment, the act of the Legislature carries with it the construction previously placed upon the law by the court." *Texas Fidelity & Bonding Co. v. City of Austin*, 246 S.W. 1026, 1029 (Tex. 1922).

Similarly, "[a]fter [the Illinois Supreme Court] has construed a statute, 'that construction becomes, in effect, a part of the statute and any change in interpretation can be effected by the General Assembly if it desires so to do.' " *Village of Vernon Hills v. Heelan*, 2015 IL 118170, ¶ 19 (quoting *Mitchell v. Mahin*, 51 Ill. 2d 452, 456 (1972)).

¶ 57    Legislative inaction following an interpretation by the Illinois Appellate Court provides some lesser support for an inference the appellate court correctly interpreted the statute. *Barrall v. Board of Trustees of John A. Logan Community College*, 2020 IL 125535, ¶ 27 n.2. The inference disappears if published opinions of the appellate court give differing interpretations of the statute. See *United States v. Powell*, 379 U.S. 48, 55 n.13 (1964) (no inference arises if published decisions show no settled judicial interpretation of the statute).

¶ 58    Here, the staffing agencies rely on two published federal decisions interpreting Illinois law. Because the federal decisions do not bind Illinois courts (*Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 302 (2001) (" 'The general rule is that decisions of the United States district and circuit courts are not binding on Illinois courts.' " (quoting *City of Chicago v. Groffman*, 68 Ill. 2d 112,

118 (1977)))), we find the proposed inference from legislative inaction very weak, but we consider it as some evidence of legislative intent. See *Wittman v. Koenig*, 831 F.3d 416, 425 (7th Cir. 2016) ("It is difficult to imagine careful drafting of legislation in this field that would not consider decisions by the federal bankruptcy courts in the state. In this situation, then, it is reasonable to treat legislative silence as at least weak evidence that the bankruptcy courts' interpretation of Wisconsin Statutes § 815.18(3)(j) has not been objectionable to the legislature.").

¶ 59 In *O'Regan v. Arbitration Forums, Inc.*, 121 F.3d 1060, 1062-63 (7th Cir. 1997), O'Regan sued her former employer, a nonprofit corporation, alleging that the employer violated both federal and Illinois antitrust law by terminating her employment because she refused to sign a noncompete agreement. The *O'Regan* court found O'Regan had not stated a claim for a federal violation because "an employee discharged for refusing to participate in an alleged antitrust violation has no standing to sue on the basis of that violation." *Id.* at 1065.

¶ 60 The court then found three separate reasons for dismissing the state claims:

"Federal antitrust standing rules apply under the Illinois Antitrust Act. *** The Act only covers services 'performed in whole or in part for the purposes of financial gain.' [Citation.] *** [The defendant] is a non-profit corporation, not covered by the Illinois Antitrust Act. Finally, to the extent O'Regan's claims relate to an alleged market for labor services, they are specifically excluded by § 10/4 of the Act ***." *Id.* at 1066.

¶ 61 The *O'Regan* court read one sentence from section 4 in isolation, without considering the Illinois Antitrust Act as a whole. The *O'Regan* court did not analyze section 4 in light of sections 2, 3, 5, and 11. The *O'Regan* court did not consider the purposes of the Illinois Antitrust Act or whether the court's broad reading of the exemption would serve the act's purposes.

¶ 62 The federal district court in *Butler v. Jimmy John's Franchise, LLC*, 331 F. Supp. 3d 786, 798 (S.D. Ill. 2018) (quoting *O'Regan*, 121 F.3d at 1066), found that several competing franchisees' alleged agreement not to hire each other's employees would (if proven) violate federal antitrust law, but the court followed *O'Regan* as binding precedent barring the claim for violation of the Illinois Antitrust Act because the alleged agreement " 'relate[d] to an alleged market for

labor services.' " *Butler* thus adds nothing to the slight authority of *O'Regan*.

¶ 63                              5. The Day and Temporary Labor Services Act

¶ 64        The Staffing Services Association of Illinois and American Staffing Association, in their brief *amici curiae*, argue that the Day and Temporary Labor Services Act (Temporary Labor Act) (820 ILCS 175/1 *et seq.* (West 2020)) comprehensively regulates all staffing agencies and therefore "the Court should hold that [Temporary Labor Act]-regulated staffing agencies are implicitly immunized from [Illinois Antitrust Act] liability."

¶ 65        The Temporary Labor Act includes a statement of the problem the legislature sought to address:

          "Recent studies and a survey of low-wage day or temporary laborers themselves [find] that as a group, they are particularly vulnerable to abuse of their labor rights, including unpaid wages, failure to pay for all hours worked, minimum wage and overtime violations, and unlawful deductions from pay for meals, transportation, equipment, and other items.

          Current law is inadequate to protect the labor and employment rights of these workers." *Id.* § 2.

¶ 66        The Temporary Labor Act has no provision penalizing collusion to reduce wages or to limit employment opportunities for these vulnerable employees. The Temporary Labor Act does not mention the Illinois Antitrust Act, nor does it explicitly exempt staffing agencies from the reach of the Illinois Antitrust Act. The ruling *amici* seek would directly conflict with the Temporary Labor Act's stated purpose, and it would exacerbate the problem of worker vulnerability the legislature sought to address. We find the Temporary Labor Act provides no support for the staffing agencies' position.

¶ 67                              6. Summary of Legislative History

¶ 68        The Illinois Antitrust Act directs courts to look to federal case law for aid in interpreting the act "[w]hen the wording of this Act is identical or similar to that of

a federal antitrust law." 740 ILCS 10/11 (West 2018). This court has held that when federal statutes differ from the Illinois Antitrust Act, we consider more carefully whether the federal courts' reasoning helps construe the Illinois act. *Gilbert's Ethan Allen Gallery*, 162 Ill. 2d at 104. The *Cordova* court persuasively argues that the United States Congress did not intend to exempt from antitrust scrutiny all agreements between competing employers to fix wages they would pay their employees and not to hire each other's employees. *Cordova*, 321 F. Supp. at 605-07. The bar committee comments and an article by one of the proponents of the Illinois Antitrust Act further support the application of *Cordova*'s reasoning to the interpretation of the Illinois Antitrust Act. Multiemployer agreements to reduce wages and to reduce employment opportunities violate the Illinois Antitrust Act unless the restrictions arose in the course of labor negotiations and "the affected employees, through their collective bargaining representatives, *** unequivocally consent[ed] to bargain with the multi-employer unit." *Id.* at 607. The minor differences in the wording and placement of the labor exemption in the Illinois Antitrust Act do not show a contrary legislative intent. The legislative inaction after *O'Regan*, which lacks precedential force in Illinois courts, does not overcome the contrary inference from the Illinois Antitrust Act's stated purposes, the statutory direction to look to federal decisions, and the discussions in the bar committee comments and Rahl's article proposing terms for state antitrust statutes.

¶ 69                                    III. CONCLUSION

¶ 70          We vacate the appellate court's answer to the question it formulated. We answer the question the circuit court certified thus: the definition of "service" in section 4 applies to the Illinois Antitrust Act as a whole, but it does not exclude all agreements concerning labor services from the act's coverage. In particular, multiemployer agreements concerning wages they will pay their employees and whether they will hire each other's employees may violate the Illinois Antitrust Act unless the agreement arises as part of the bargaining process and the affected employees, through their collective bargaining representatives, have sought to bargain with the multiemployer unit. We do not address the second question the circuit court certified (see 2022 IL App (1st) 210840, ¶ 1), or the appellate court's answer to that question, because the parties have not asked this court to address that

question in this appeal.

¶ 71        Appellate court judgment vacated in part.

¶ 72        Certified question answered.

¶ 73        Cause remanded.

¶ 74        JUSTICE CUNNINGHAM took no part in the consideration or decision of this case.